### M. A. VERAMENDI ET AL. V. W. J. HUTCHINS ET AL.

1. COMMUNITY PROPERTY.—It is believed to be a doctrine thoroughly incorporated into our legal system, that the interest of the husband and wife in community property is equal, and that it is immaterial whether the grant or deed thereto be in the name of the husband or wife separately, or to them jointly.

2. SAME—POWER OF SURVIVOR TO SELL.—After the death of the wife, the husband cannot, by deed or bond, convey title, or color of title, to the interest of his deceased wife in the community property, unless empowered to sell or convey, by reason of community debts or obligations.

3. LIMITATION OF THREE YEARS — SURVIVOR'S DEED NOT COLOR OF TITLE. — An unauthorized conveyance, by the surviving husband, of community property, after the death of the wife, does not convey title, or color of title, to the interest therein vested in her heirs; and as to such interest, such conveyance will not support a defense of limitation of three years.

4. COMMUNITY DEBTS, AN AUTHORITY TO SELL PRESUMED, WHEN. —In a suit brought for the interest of the deceased wife against the vendees of her husband, made after her death, instituted over thirty years after such sale, and twenty-five years after possession had been taken under the sale, when during that time the conveyance had been of record, and no claim asserted adversely, it seems that the jury might have been instructed that they were at liberty to presume that the facts existed authorizing the sale.

5. SAME.—Quere: If a deed or a power of attorney may be presumed, why may not the facts which are equivalent to a power of attorney, and which, unlike a power of attorney, would not ordinarily be evidenced by writing, more readily be presumed?

6. PRACTICE—RECORDS.—An affidavit by one of several defendants, that a bond or deed, duly recorded, has been lost or mislaid, and that affiant proposed to use in evidence a copy from the records, is sufficient basis to admit the copy, at least in favor of the affiant. Nor is such right affected by mere pleading by the adverse party, alleging that the record had been tampered with, and its terms altered.

7. CONTRACTS TO PERFECT TITLE BY LIMITATION.—A contract between parties whose title deeds are of record, providing for placing tenants upon their land, in order to perfecting title by five years' limitations, is not illegal. Nor were they required to place on record their contract with their tenants so holding possession.

8. LIMITATION, WHEN STOPPED BY SUIT. — Where a petition was

| 48 | 531 |
| 75 | 409 |
| 48 | 531 |
| 79 | 349 |
| 79 | 413 |
| 48 | 531 |
| 81 | 28 |
| 81 | 458 |
| 48 | 531 |
| 84 | 251 |
| 48 | 531 |
| 89 | 229 |
| 90 | 554 |

filed, and several years elapsed before citations were issued, limitation runs to the issuance of citation, and is not stopped by the filing of the petition.

APPEAL from Colorado. Tried below before the Hon. L. Lindsay.

This was an action of trespass to try title, brought in the District Court of Colorado county, by the heirs of Mrs. James Bowie, to recover one-half of a league of land granted to him during his wife's lifetime, and against J. H. Hutchins, John D. Andrews, John McKennon, J. M. Wolsey, Joseph Took, and —— Baur, defendants.

Citations were made out for defendants January 24, 1867, which were indorsed issued on same day; but no evidence appears that they ever passed into the hands of the sheriff. April 18, 1867, alias citations were made out and indorsed in same manner, it not appearing that the sheriff ever received them.

May 17, 1871, citations were again issued, which were served on all the defendants, except Took.

June 9, 1871, plaintiffs had leave to make new parties, and August 23 the amendment was filed, making a large number of new parties defendants.

The defendants pleaded not guilty, stale demand, laches, limitation of three, five, and ten years, and suggestion of improvements in good faith.

The grant was made to Bowie on April 20, 1831. He was married in March, 1831, in the old church on the Plaza, in San Antonio, to Ursula Veramendi, daughter of Governor Veramendi. In September, 1833, Mrs. Ursula Bowie died, of cholera, in the city of Monclova, Mexico. Her father and mother died of the same disease—the father first, the mother next; and the day following Mrs. Bowie died.

The heirship of plaintiffs to Mrs. Ursula Bowie was shown by the evidence.

The title papers forming the basis of the title of the defendants are sufficiently described in the opinion.

There was much testimony as to the movements of Colonel Bowie in October, 1835, and of the early history of the occupation of the land sued for, the occupation dating back of 1836, under the title claimed by the defendants.

A question was raised on the admissibility of a certified copy of the bond from Bowie to W. Richardson for the Bowie league.

Andrews, one of the defendants, at a term of court prior to the trial, made affidavit that it was lost or mislaid, and gave notice that a copy from the record would be offered. To the copy, it was objected that the affidavit should have been made on the trial, and should have been made by all of the defendants.

The plaintiffs also sought, by their pleadings, to throw suspicion upon the record, by alleging that the record had been tampered with and altered. The objections were overruled and the copy admitted.

The testimony showed that Hutchins and Andrews had contracted with W. T. Townsend that he should occupy and hold possession of two-thirds of said league, claimed by them, for five years; and that, under the contract, Townsend did hold and occupy the same for five years, beginning in 1856 and ending in 1861. The written contract was not recorded, and was produced in evidence. The plaintiffs excepted to the testimony as in fraud of the law.

Many defendants were purchasers after the filing of the suit in 1867, and before their vendors were made parties or were served with process.

The charge of the court is sufficiently given in the opinion.

The jury found for the defendants, and the plaintiffs appealed.

*John T. Harcourt,* for appellants.— * * * The next error complained of in the bill of exceptions relates to the affidavit of the loss of the original bond from James Bowie to William Richardson, because it was only made by one de-

fendant, John D. Andrews, and had been made more than a year previous to the trial.

The record books are only copies, and are not admissible without a compliance with the statute, accounting for the non-production of the originals. (Styles v. Gray, 10 Tex., 503; Peck v. Clark, 18 Tex., 240.)

This question is fully settled in the case of Younge v. Gilbeau, 3 Wall., 641. The court say: "The affidavits of its loss only negatived, upon information and belief, its possession by some of the defendants. Its possession by some of them was consistent with every averment made. The defendants relied alone upon the copy from the record, and the court erroneously held that such copy was sufficient." (Paschal's Dig., art. 3716.)

The affidavit should have been made upon the day of trial, and by both Hutchins and Andrews.

"There ought to be a strict compliance with the statute, it being in derogation of the common-law rule of evidence." (Crayton v. Munger, 11 Tex., 234; Butler v. Dunagan, 19 Tex., 566.)

We now invite attention to the instructions asked by the plaintiffs, and refused by the court:

1. "The jury are instructed, that, upon the death of Mrs. Ursula Bowie, one undivided half of the league of land was vested immediately in her heirs, and could not have been legally sold by James Bowie, unless in payment of community debts.

2. "The purchaser of the whole league from James Bowie, after the death of his wife, would take subject to the descent cast upon the heirs of the wife, and said purchaser would hold the one-half of said league of land in trust for the heirs of said wife, and all subsequent purchasers would be affected by said trust.

3. "You are charged that the title bond alleged to have been executed by James Bowie to William Richardson on the 15th of October, 1835, was an executory contract for the sale of the

said league of land, and did not have the effect to pass the legal title. It was, at most, only an equitable title to the league, and the vendee, Richardson, had ten years from the date of said bond within which to perfect his title, by a suit on the bond for specific performance; and having failed to show such a title, all the parties claiming under Richardson have no legal title as his vendees, and are now barred by the lapse of time from enforcing their title bond.

4. "Upon the death of Mrs. Bowie, her surviving husband, James Bowie, held an undivided half of the said league in trust for the heirs of his deceased wife, and any sale to Richardson, after her death, would be affected by said trust; and the vendee, taking the title with the knowledge of the trust, would be charged with holding the same in trust for the heirs of the deceased wife.

5. "No limitation or lapse of time would run against or bar the claim of the heirs of the deceased wife, until the purchasers from Bowie had openly and notoriously repudiated the said trust, by an adverse holding of the entire league against the heirs of the deceased wife.

6. "The possession of one tenant in common, is the possession of all, and until there was an express repudiation of the trust, the possession of the vendees under James Bowie would be the possession also of the heirs of the deceased wife.

7. "The said Richardson and his vendees never acquired any legal title to any portion of said league by virtue of the bond for title from James Bowie, and said Richardson and his vendees never having perfected their legal title within the ten years allowed by law, they could convey no legal title.

8. "The purchasers of said land from Richardson and his vendees must rely, for title, either upon their adverse possession of five years, under a deed or deeds duly recorded, attended with all the incidents of ownership required by the statute, or upon ten years of such possession. Three years' adverse possession cannot avail them in this suit.

9. "The laws of limitation in this State were suspended from the 28th day of January, 1861, up to the 30th of March, 1870, and this time should not be computed in determining the adverse possession."

1. We think the first instruction asked is now the settled law on the subject, and it ought to have controlled the case. (Paschal's Dig., p. 778, note 1051.)

2. The second instruction is the law that should have been given. (Wilkinson *v.* Wilkinson, 20 Tex., 237.)

3. We think the third charge asked was a proper construction of the title bond. (Secrest *v.* Jones, 21 Tex., 121; Browning *v.* Estes, 3 Tex., 473.)

A party having right of entry into real estate must make entry in ten years, &c. (Paschal's Dig., art. 4621, note 1030.)

In support of the third instruction, we refer also to the following authorities: 2 Story's Eq., 715; Hemming *v.* Zimmerschitte, 4 Tex., 165; Estes *v.* Browning, 11 Tex., 237; Vardeman *v.* Lawson, 17 Tex., 15; Mitchell *v.* Sheppard, 13 Tex., 484; Smith *v.* Hampton, 13 Tex., 463; Glasscock *v.* Nelson, 26 Tex., 150.

4. The fourth instruction was the law, as settled in the case of McMasters *v.* Mills, 30 Tex., 593.

5. The fifth instruction was applicable and pertinent to the case, and should have been given. (Bailey *v.* Trammell, 27 Tex., 317; Roberts *v.* Thorn, 25 Tex., 728.)

6. The sixth instruction is a familiar rule of law. (Alexander *v.* Kennedy, 19 Tex., 488; Gilkey *v.* Peeler, 22 Tex., 663; Portis *v.* Hill, 3 Tex., 273; Bailey *v.* Trammell, 27 Tex., 328.)

7. The seventh instruction should have been given, as a proper construction of the title bond.

8 and 9. The eighth and ninth instruction should have been given.

The charge of the court, as given, did not instruct the jury fully as to the time of the suspension of the statutes of limitation.

The charges asked by plaintiffs, in relation to the genuine-

ness of the title bond, were important issues, that should have been given to the jury.

Plaintiffs also objected to the admissibility in evidence of the mutilated record of the bond.

On the day before the trial, the plaintiffs' counsel made a personal examination, for the first time, of the record of the bond, and immediately filed an amendment, charging that a base fraud had been committed by Richardson, in the date and terms and conditions of the bond, and called for the production of the original.    *    *    *  ˙

I contended before the jury, and now insist before this court, that the historical facts, which the court must judicially know, will demonstrate that the pretended sale of the league of land by Colonel Bowie, on the 15th of October, 1835, was a fraud.

First, because the instrument itself recites a lie on its face, when it states that "it is at present impracticable to execute a warranty title to said William Richardson, in consequence of war, and the absence of a recording officer."

The attesting witnesses are R. M. Williamson and J. G. W. Pierson.    It is made to appear, in the case of McKissick *v.* Colquhoun, 18 Tex., 149, that the witness J. G. W. Pierson was acting, on the 5th of October, 1835, as second judge of the first instance, before whom the warranty title could have been legally executed.

It also appears, from the case of Secrest *v.* Jones, 21 Tex., 122, that the other witness, R. M. Williamson, was the only alcalde of the jurisdiction of Austin before whom the title could have been made.

I proceed now to show that Colonel Bowie and the attesting witnesses were separated at least two hundred miles at the date of the pretended sale.   Colonel Bowie resided in San Antonio, at the mansion of Governor Veramendi.   He was a man of wealth, and there was no occasion for him to sell his headright league.

Colonel J. W. E. Wallace testifies that Col. Bowie was in the army from the first fight at Gonzales until the fall of the Alamo, and perished with the brave defenders of the Alamo. Colonel Wallace was the lieutenant-colonel under Colonel John H. Moore, as organized at Gonzales, on the 1st day of October, 1835, and the first fight occurred at Gonzales on the 2d of October, 1835. (Yoakum's History of Texas, vol. 1, 363.)

Colonel Austin was chosen commander-in-chief of the forces at Gonzales on the 10th of October, and on the 12th of October it was determined to set out on the march for San Antonio with a force of 500 men. (Yoakum, vol. 1, 368.) Here was an earnest appeal to every patriot to hasten to the front; and can it be believed that the gallant Bowie was skulking about San Felipe, in the jurisdiction of Austin, in order to sell his league of land? Colonel Wallace was intimate with him, and had passed through Colorado county frequently with him, and never heard him offer to sell the land. The witness Ijams says that Bowie was at San Antonio when he got there, on the 15th of October, 1835.

And at such a time, with the impending struggle,—the war actually begun,—who can believe that the adventurer Richardson would have paid $5,000 for such a purchase?

But we find the attesting witnesses also two prominent men, well known in history. They were both members of the consultation that assembled in San Felipe on Monday, the 16th day of October, 1835. (Yoakum's Texas, vol. 1, 370; Id., vol. 2, 11.)

Thirty-two members were present on the 16th, and on the 17th they adjourned until the 1st of November.

Some of the members of the consultation joined the army, but as "three-legged Willie" (R. M. Williamson) was a cripple, it is not likely that he did so, but remained to assist the council at San Felipe.

We find Captain Bowie actively engaged in the field, near Bexar, on the 27th of October. (Yoakum, vol. 1, 373.) These

facts, we believe, are sufficient to throw discredit upon the alleged title bond, and the question of fraud should have been submitted to the jury.

It is no sufficient answer to this charge of fraud to say that the record books were in the hands of the clerk, and to pretend that the alteration was made by the clerk.

There was no motive for the clerk to change the record, and it is immaterial by whom made, the law demands an explanation before any mutilated paper can be read in evidence.   *   *   *

We proceed to show that the adverse possession of the defendants cannot avail them, so as to obtain title by limitation.

So far as the " 200-acre Thompson reservation " is concerned, there was no proof, by a solitary witness, as to the terms or conditions of the verbal sale or the description of the boundaries.   The number of acres was a part of the " erasure and obliteration " on the record.

There was no partition or legal appropriation of the 200 acres by any specified boundaries.

" One joint tenant, or tenant in common, cannot convey a distinct portion of the estate by metes and bounds so as to prejudice his co-tenants or their assignees."   (Trammell *v.* McDade, 29 Tex., 360; McGahan *v.* Baylor, 32 Tex., 795; Taylor *v.* Ashley, 15 Tex., 53.)

" A party cannot claim the protection of the statute of limitation against his co-tenant."   (Bailey *v.* Trammell, 27 Tex., 328.)

This man Thompson never lived on the land after the " runaway scrape " in 1836, and there is no legitimate title shown from him to any of the parties in possession.

It was important, in view of the number of defendants, that the court should have submitted the " special issues," to ascertain the facts as to adverse possession.

This suit was instituted on the 14th of January, 1867, to recover the undivided one-half of the league.

This was an adverse suit to recover the estate, which interrupted the peaceable possession. (Paschal's Dig., art. 4621.)

The first answer was filed on the 21st of February, 1873.

It will be observed, that the answers of the defendants do not conform to the requirements of article 5295 of Paschal's Digest. They do not plead title by possession, and set out the land so claimed by metes and bounds.

It is attempted to maintain the title by the five years' limitation, under a secret, unrecorded agreement, dated 24th of November, 1856, made by Hutchins and Andrews with W. T. Townsend.

It is believed that it would be a perversion of the object and policy of the law to permit such a contrivance (to acquire title by possession) to take the place of an honest occupancy by one having a claim of right, which may ripen into a valid title, because he tills the soil and in good faith makes it his home. The law of limitation is said to be a statute of repose. It is not an engine for assailing the rights of others through craft and cunning.

Townsend's possession would put the plaintiffs upon inquiry perhaps; but when they examined the records they would find that he was but a squatter, with no claim of title, and they could safely permit him to occupy the premises. No notice of possession was brought home to the plaintiffs, who lived in a distant country.

But if wrong in this, we still insist that this possession could not avail in this case.

Townsend did not hold the possession himself. He put others in possession of a little shanty about the 30th of November, 1856.

The statute of limitation was suspended on the 28th of January, 1861, and did not commence to run again until after the institution of this suit.

For the reasons heretofore discussed, the three years' limitation cannot avail the defendants, because they could not

deraign title from or under the sovereignty of the soil, or even a color of title.

All the purchasers from Hutchins and Andrews are affected with *lis pendens.*

These were *mala-fide* purchasers *pendente lite,* and acquired no interest as against the plaintiff's title. (Briscoe *v.* Bronaugh, 1 Tex., 332.)

The delay in the prosecution of this suit was very natural and unavoidable.

It was just after the close of the war. There were incompetent judges on the bench to try such a cause. The plaintiffs were Mexican citizens, living in San Antonio, and it was difficult to communicate with them in procuring the proof, &c.

The defendants were numerous, and their influence great. Must the plaintiffs' rights be defeated because they could not overcome these unavoidable obstacles?

We feel convinced that the record is full of errors, and that the case must be reversed and remanded.

This court will not listen to the charge in appellee's brief, which was used with effect before the jury: "That this is an old case, brought before the courts to disturb the peace of the country, and impede the settlement of lands."

In the language of a distinguished judge of the Queen's Bench: "However, a judge is bound not to follow his own view as to what is a convenient course. He must measure the rights of the plaintiff, not by the 'crooked cord of private discretion, but by the golden mete-wand of the law.'"

*R. V. Cook* and *Foard, Thompson & McCormick,* for appellees.—Admitting that the appellants inherited from their ancestor, Josefa Ruiz Navarro, the grandmother of James Bowie's wife Ursula, and that their suit was brought for the half of the league of land in controversy at the date of the filing of the original petition on the 14th of January, 1867, yet it is manifest, from the proof in the cause, that they cannot recover against W. J. Hutchins and John D. Andrews,

and their vendees, for the reasons that they are barred by the statute of limitations, and by their laches.

I. In regard to laches. The land in controversy was granted by the Mexican Government to James Bowie, in 1831. Ursula, the wife of Bowie, died in 1833. Upon her death, according to the theory of the appellants, her grandmother, Josefa Ruiz Navarro, inherited her portion of the league,— or, rather, the half of it. On the 15th of October, 1835, Bowie sold all of the league—excepting 200 acres which had previously been sold by him to William Thompson—to William Richardson, by bond for title, acknowledging payment of purchase-money. This sale was made in the lifetime of the grandmother, who, according to some of the witnesses, lived until 1837. (Transcript, page 302.) Now, if James Bowie, upon the death of his wife, in 1833, held one-half of the league in trust for the heirs of his wife, the said heir being Josefa Ruiz Navarro, her grandmother, it was such a trust as could have been repudiated. The sale to Richardson was a renunciation of the trust. Then arises the question,— Did the *cestui que trust*, Mrs. Navarro, have knowledge of this renunciation, or could she, by the use of ordinary diligence, have obtained that knowledge? The bond for title from Bowie to Richardson was first placed upon record in Austin county, and was afterwards recorded twice in Colorado county, in book B of bonds, page 126, and in deed book B, pages 122 and 123. These registrations were made as early as 1839 or 1840. It will be observed, that neither minority nor coverture was pleaded or proved by appellants; and, so far as this cause is concerned, all of the appellants must be presumed to have been of full age, and to have had the legal capacity to sue, at least upon the death of the grandmother, in 1837. This bond having been placed upon the records of Colorado county, in which county the land is situated, as early as 1839 or 1840, and the appellants, in 1837, being of full age and capable of bringing their suit, the record of said title bond was such a notorious act that the appellants will be

presumed to have had notice from that time of the renuncia-
tion of the trust by Bowie.    Now, twenty-eight years elapsed
from the date of the record of this bond to the institution of
this suit; and the appellants, with a full knowledge of the
sale from Bowie to Richardson for that period, delay for
over a quarter of a century to claim their rights by process
of law.    Instructions were asked by appellees on the ques-
tion of laches, and refused.

As to the nature of the trust in favor of the appellants,
and that the sale by Bowie was a renunciation of the trust,
and that the record of the title bond from Bowie to Richard-
son, in Colorado county, was such a notorious act that appel-
lants were presumed to have had notice of the renunciation
of the trust from the date of said record, and, after hav-
ing had said notice, twenty-eight years elapsed before suit
brought, that the rights of appellants are lost by laches, see
the following authorities: Turner *v.* Smith, 11 Tex., 620;
Robertson *v.* Wood, 15 Tex., 5; Winburn *v.* Cockran, 9 Tex.,
123; De Cordova *v.* Smith, 9 Tex., 129, 145; Smith *v.* Montez,
11 Tex., 24; Yeary *v.* Cummins, 28 Tex., 91; Anderson *v.*
Stewart, 15 Tex., 291; San Antonio *v.* Lewis, 15 Tex., 393;
Holman *v.* Criswell, 15 Tex., 399; Early *v.* Sterrett, 18 Tex.,
117; Story's Eq. Jur., sec. 1520; Carlisle *v.* Hart, 27 Tex.,
352; McMasters *v.* Mills, 30 Tex., 592; Andrews *v.* Smith-
wick, 34 Tex., 546; Hudson *v.* Wheeler, 34 Tex., 356; Jones
*v.* Jones, 15 Tex., 148; Burleson *v.* Burleson, 28 Tex., 385.

II.  The appellants objected to the introduction in evidence
of the written agreement between Townsend and Hutchins
and Andrews, providing for holding adverse possession of the
land.    But it is submitted that the objection was trivial.
The records of the county already show that Hutchins and
Andrews claimed the title to the lands; and the written
agreement, if recorded, could give no greater notoriety to
their claim.    Besides, it was the actual occupancy of the
lands by Hutchins, which was a notorious fact, for more than
three years,—that occupancy being continuous, adverse, and

unbroken. Under the three years' limitation, it is not incumbent upon the defendant, in proper person, to hold possession for that period. If the occupancy be by an agent or a tenant, the possession is complete.

If the possession be in privity with him, in his name and stead, and for and on his account, it is, in law, his possession; he may be charged with the responsibility of it, and may avail himself of its benefits. (Whitehead *v.* Foley, 28 Tex., 14; Williamson *v.* Simpson, 16 Tex., 444; Christy *v.* Alford, 17 How., 601, 602; Doswell *v.* De la Lanza, 20 How., 32; Gillespie *v.* Jones, 26 Tex., 345.)

The case of Gillespie *v.* Jones is very similar to the case we are now considering, so far as the holding by Townsend, for Hutchins and Andrews, is concerned. There Jones, the landlord, had his deed upon record, and his deed to Borman was not recorded, though in writing. The court said it was not necessary to record. Jones relied upon the five years' limitation. (Sapp *v.* Newsom, 27 Tex., 537.) Townsend, in his testimony, names the different tenants who held under him the land in controversy. That such possession will answer the requirements of the statute, we confidently refer to the authorities last cited.

In Whitehead *v.* Foley, the witness held possession for Foley, without any written authorization from him; and when he removed from the premises, Bullock took possession after witness, under verbal authority. Now, to make out the three years' limitation, it was necessary to add the possession of witness to the occupancy of Bullock in computing the time. This seems to us to be a very strong case in our favor, especially when we consider that Townsend's occupancy was by virtue of written authority from the appellees, which was given cotemporaneously to the going into possession by Townsend.

III. Hence we conclude that Hutchins and Andrews and their vendees are protected in their possession by virtue of the three years' limitation pleaded. Now, when was this suit

really commenced? As to the parties named in the original petition, on the 16th day of May, 1871; and as to those named in the amended petition, on the 11th day of February, 1873, as we believe, and contend for. The proof shows that the original petition was filed on the 14th day of January, A. D. 1867. Citations were made out for the appellees, Hutchins and Andrews, Took and J. M. Wolsey, by the clerk, but they never went out of his office and into the hands of the sheriff. The plaintiffs below allowed the case to slumber until the filing of a cost bond on the 16th day of May, 1871; and no other writs were issued until after the filing of a cost bond on the 16th of May, 1871. Under this state of case, can the mere filing of the petition be considered as the beginning of the suit? (Maddox v. Humphries, 30 Tex., 494; Hoffman v. Cage, 31 Tex., 595.)

Now, the depositions of appellant's witnesses show that upon the death of Mrs. Ursula Bowie, in 1833, her heir was Josefa Ruiz Navarro, her maternal grandmother. Mrs. Navarro died in 1837, and left, as her heirs, four sons and one daughter, and the children of Mrs. Bowie's mother. Consequently, the inheritance was divided into six shares, the brothers and sisters of Mrs. Bowie being entitled to the one-sixth thereof. Now, the only parties named in the plaintiff's original petition are the brothers and sisters of Mrs. Bowie, and they can only claim one-sixth of the inheritance. In this petition, we find the name of Teresa Veramendi de Rodriguez, wife of Jesus Rodriguez. The testimony shows that she married and died in the lifetime of her grandmother; consequently, the only parties named in the original petition who could have any interest in the land were Maria Antonia de Sierra and Marco A. Veramendi, a resident of Mexico. The sons of Josefa Jose Veramendi, and the nephews and brother of Mrs. Bowie, were not made parties until the filing of the amended petition, February 11, 1873. Here are parties who, if entitled at all, are only entitled to one-twelfth of the land, suing those in possession for the whole; while those

who claim to own eleven-twelfths of the same are not made parties until after the expiration of six years and one month from the filing of the suit. Under this state of facts, we contend that those in possession of the land can claim the benefit of limitation, as against those representing the eleven-twelfths of the interest, up to the date of the filing of the amendment, making them parties to the suit. (Hopkins *v.* Wright, 17 Tex., 35.) In Burleson *v.* Burleson, 28 Tex., 417, Judge Smith, in rendering the opinion, says that "Aaron Burleson and James Burleson, though parties plaintiffs in this suit, had conveyed their interest in the land, before the commencement of the suit, to the intervenors, Howard and Sutton, who intervened and were made parties in their own right, May 24, 1859. We are of the opinion that limitation, if running at all, was not suspended as to the shares they owned, until the date of their intervention, May 24, 1859. Their interests were not in litigation before that date." Now, in accordance with this opinion, if the parties representing the eleven-twelfths of the inheritance had intervened, limitation would not have been suspended until actual filing of the plea of intervention. Is it otherwise if the parties are made by an amended petition? We think not. We respectfully urge that the force of reason and authority is the same in both instances.

If we are correct in the position assumed by us, Hutchins and Andrews and J. M. Wolsey are entitled to hold the land against those representing the eleven-twelfths interest by virtue of the five years' limitation, because limitation, though suspended on the 28th of January, 1861, commenced again on the 30th of March, 1870.

IV. We also asked the court to instruct the jury, that the defendants in possession of the land were entitled to add to their own possession the occupancy and possession of their vendors, in order to prescribe under the three and five years' limitation. The court, however, refused to give the charges, but instructed the jury directly to the contrary. According

to the view of the judge, as gathered from his charge, he who claims by virtue of the three or five years' limitation must remain himself on the lands for the full period of time. Here is the logical effect of that doctrine: Lands may have been holden in actual occupancy for several generations of unbroken and continuous possession; yet if the defendant against whom suit instituted has not himself had and held possession for the periods prescribed by the statute, he cannot avail himself of limitation. We believe that this doctrine has never been recognized as the law in the State of Texas. We refer to the authorities already cited. (Whitehead *v.* Foley; Williamson *v.* Simpson; Doswell *v.* De la Lanza; Gillespie *v.* Jones.)

In the case last cited, the law is decisively settled and decided. (See, also, the case of Cunningham *v.* Frandtzen, 26 Tex., 38.)

GOULD, ASSOCIATE JUSTICE.—Colonel James Bowie, in 1831, received a grant of a league of land as a married man, and a colonist of Austin's colony. His wife Ursula died in 1833, leaving no children. On January 14, 1867, the surviving brother and sisters of Mrs. Bowie, claiming to be her heirs, filed their petition of trespass to try title to the undivided half of the league in the District Court of Colorado county, making W. J. Hutchins, John D. Andrews, and four others defendants. It seems, however, that the citations for defendants were first placed in the sheriff's hands in May, 1871; at which time service was had on all of the defendants except one. In August of that year an amended petition was filed, making more than forty defendants, in addition to those first sued. On February 11, 1873, another amended petition was filed, alleging, that, at Mrs. Bowie's death, her grandmother, Josefa Ruez y Navarro, was her heir; that this grandmother (who, it afterwards appears, died in 1836 or 1837) left four sons and one daughter, all dead, but most of them leaving descendants, who are attempted to be named, and who are made co-plaintiffs.

The answers of defendants show that a number of them, occupying portions of 200 acres in the northwest corner of the league, claimed that this 200 acres was sold by Colonel Bowie during his wife's lifetime. All of the other defendants claim under a title bond, alleged to have been made by Bowie to one William Richardson, as follows:

"DEPARTMENT OF BRAZOS, }
    "*Jurisdiction of Austin.* }

"Know all men by these presents, that I, James Bowie, resident citizen of the jurisdiction aforesaid, am held and bound, and by these presents do bind myself, my heirs, executors, administrators, and assigns, in the penal sum of twenty thousand .dollars, to William Richardson."

Now, the condition of the above obligation is such, that whereas the above-bounden has sold one league of land to said William Richardson, conceded by the Mexican Government, under Stephen F. Austin's contract of colonization, situated on the Navidad creek, or river, adjoining Thompson's and others, with a reservation in favor of Thompson of 200 acres, including the spring of water where said Thompson now resides, for five thousand dollars to me in hand paid by said Richardson; and whereas "it is at present impracticable to execute a warranty title for the same to said William Richardson, in consequence of war, and the absence of a recording officer, now, should the above-bounden execute, or cause to be executed, a full and complete title to the above league of land, then this obligation to be of no effect; otherwise, to remain in full force and virtue. This 15th day of October, 1835.

                                   "JAMES BOWIE.
   "Witnesses: R. M. WILLIAMSON.
                    J. G. W. PIERSON."

This bond was first recorded, or rather a copy thereof was recorded, in Colorado county in 1839, on proof of the handwriting of R. M. Williamson, one of the witnesses. In November, 1840, however, the execution of the bond was proven

up by Williamson, and it was thereupon again recorded in Colorado county.

Colonel Bowie lost his life at the fall of the Alamo, on March 6, 1836. In June, 1840, Richardson made his title bond to Kidder Walker for the land sold to him by Bowie, reciting a consideration of $1,500, $500 of which was acknowledged as received. Subsequently, however, to wit, on January 7, 1843, Walker accepted a deed for 1,600 acres, lying adjacent to the 200 acres reserved in Bowie's bond, and with that 200 acres forming a tract of 1,800 acres, in full satisfaction of his claim under the bond of Richardson, and released the balance to Richardson. Some of the defendants claim under Walker, and there is evidence of continuous occupancy of this part of the league by Walker and his vendees, from 1840 down. In 1843, Richardson conveyed to Hutchins the undivided third of the 2,628 acres of the league remaining unsold, and afterwards, in the same year, conveyed the other undivided two-thirds to defendant Andrews, under whom the other defendants not heretofore alluded to claim.

The pleadings of the numerous defendants need not be detailed. They embody, at least some of them, the defense of the great delay and laches of plaintiffs in suing; the defense of limitation of three, five, and ten years; and the further defense, that the sale by Bowie was made to pay community debts; and embodied, also, a suggestion of improvements in good faith.

The evidence showed that the improvements on the league were numerous and valuable; that the 200-acre reservation was occupied by Thompson up to 1836. But whilst there was evidence which might have supported a verdict, as to some of the defendants, under the limitations of five and ten years, it was questionable whether Hutchins and Andrews, and some at least of those claiming under them, could be protected by any other limitation than that of three years; and it becomes an important question, whether any of the defendants, and especially those claiming under the title

bond of Bowie, had shown such title, or color of title, as to be within the statute.

The plaintiffs asked the court to charge, that three years' adverse possession could not avail the defendants. This was refused; and the jury were instructed, that if they "believe, from the evidence, that the defendants, or any of them, have had possession of their several portions of the land in controversy for three years before suit is brought, and have held possession under title, or color of title,—that is, by a regular chain of transfer from and under the sovereignty of the soil, or a transfer to the persons in possession by deeds of conveyance deducible from the sovereignty of the soil, not registered, or not duly registered, or such transfers were only in writing, provided there be intrinsic fairness and honesty in such transfers,—such of said defendants who have so been in possession for three years are protected by law, and cannot be ejected, even by those who have a better and paramount title."

There was a verdict and judgment for the defendants; and the first question which it is proposed to consider, is whether there was error in this charge and the refusal of the charge asked.

The league being community property, on the death of Mrs. Bowie her community half thereof, by operation of law, vested in her heirs, subject to administration, and to the right of her surviving husband to wind up the community affairs. It is believed to be a doctrine thoroughly incorporated into our legal system, that the interest of the husband and wife in community property is equal, and that it is immaterial whether the grant or deed thereto be in the name of the husband or wife separately, or to them jointly. (Scott v. Maynard, Dallam, 548; Love v. Robertson, 7 Tex., 9; Edwards v. James, 7 Tex., 382; Huston v. Curl, 8 Tex., 240; Wright v. Hays, 10 Tex., 130; Parker v. Chance, 11 Tex., 517; Thomas v. Chance, 11 Tex., 637; Chapman v. Allen, 15 Tex., 283; Allen v. Harper, 19 Tex., 502; Higgins v. Johnson, 20 Tex.,

389; Mitchell v. Marr, 26 Tex., 331; Cooke v. Bremond, 27 Tex., 460; Zorn v. Tarver, 45 Tex., 520.)

It follows that the sale by Colonel Bowie to Richardson, whether by title bond or by deed, could not convey to Richardson title, or color of title, to his deceased wife's community interest, unless, indeed, he was empowered to sell or convey by reason of community debts or obligations. (Thompson v. Cragg, 24 Tex., 596, 597.) Color of title, in the meaning of the statute, differs from title only in externals, and not in substance. Although the grant was in the name of Colonel Bowie, on the death of his wife no conveyance by him was essential to perfect the title of her heirs, and his unauthorized conveyance to others could not convey the title thus vested in those heirs. As to those defendants claiming under Richardson, there was the same hiatus in their claim of title as in the case of Thompson v. Cragg; and it was error in the court to charge as it did on that subject. Although the assignment of errors is very general, we are of opinion that this error in the charge is of such a character that it cannot be overlooked. There is nothing in any other portion of the charge to correct the error, and as it may have led to the verdict for the defendants, we think that it must now lead to a reversal of the judgment.

It has been stated that one of the defenses was that the sale by Colonel Bowie was made to pay community debts. No direct evidence was offered in support of this defense, and it seems to have been assumed, on the trial, that there was, in fact, no evidence justifying a charge on the subject. Indeed, the court instructed the jury, that on Mrs. Bowie's death one-half of the league was the property of her heirs at law, and was not subject to the disposition of the surviving husband; and as no further charge on that point was given, it is evident that the defense that Bowie sold to discharge community obligations, was not submitted to the jury. We are of opinion, however, that, in view of the great lapse of time after the sale by Colonel Bowie, being over thirty years,

before suit brought; that for over twenty-five years before
suit parties had been in possession, claiming under this bond,
which during all that time was of record; and that during all
this time there is no evidence of any claim by Mrs. Bowie's
heirs in opposition to the title bond, the jury might have
been instructed that they were at liberty to presume that the
facts existed which authorized Colonel Bowie to convey.
Says Justice Wheeler, in Watrous v. McGrew, 16 Tex., 513:
"A power to execute a deed will in many cases be presumed.
(2 Cow. & Hill's Notes to Phil. Ev., 812, 813.) In most
cases where a deed would be evidence as an ancient deed
without proof of its execution, the power under which it pur-
ports to have been executed will be presumed. (Id.; and
see, also, 4 Pick., 162; 4 Greenl., 248; 1 Hill, 389; 9 Johns.,
169.) In Louisiana, it has been held, that where possession
had followed a sale made by an attorney in fact for a period
of twenty or more years, the authority of the attorney might
be presumed. (Buhols v. Bondousquie, 6 Martin N. S., 153.)
So it has been held, that the acquiescence of the principal in
the possession under the conveyance, for nearly twenty years,
will authorize the presumption that a condition precedent, on
which the attorney was to convey land, had been fulfilled,
and that he had not transcended his power. (McConnell v.
Bowdry's Heirs, 4 Monroe, 395. See, also, Dailey v. Starr,
26 Tex., 562; Johnson v. Shaw, 41 Tex., 428.) If the heirs of
Mrs. Bowie knew that the land was held and claimed under
this bond of Colonel Bowie's, their failure to assert their
rights for so long a period, during which it seems the land
has been improved so largely, tends to raise a natural pre-
sumption that they knew "that no wrong had been com-
mitted." (Meaner v. Hamilton, 1 Casey, 143; Foulk v.
Brown, 2 Watts, 216.) After the lapse of near forty years,
it is not to be expected that direct evidence could be produced
of the existence of community debts. The principal ground
on which deeds over thirty years old, which have been acted
on, and which come from the proper custody under circum-

stances free from suspicion, are admitted in evidence without proof of execution, is that the subscribing witnesses are presumed to be dead, and other proof beyond the reach of the party. (1 Greenl., sec. 570.) If a deed or a power of attorney may be presumed, why may not the facts which are equivalent to a power of attorney, and which, unlike a power of attorney, would not ordinarily be evidenced by writing, more readily be presumed? (See Stockbridge *v.* Stockbridge, 14 Mass., 257; Jarboe *v.* Macatee, 7 B. Mon., 279; 2 Wharton on Ev., sec. 1350.)

But whilst we think that the facts in evidence called for the submission to the jury of the question as to the existence of community obligations authorizing Colonel Bowie to sell, with appropriate instructions on the subject of presumptions, we do not design to express any further opinion on this branch of the case. Evidently, it is one which was not much considered on the trial; and it may be that on another trial further light may be thrown on both the law and the facts.

A question has been discussed growing out of the fact that one of the defendants, Andrews, filed an affidavit that he could not procure the original title bond from Bowie to Richardson, and that it had been lost or mislaid, stating that he proposed to use in evidence a copy from the records.

The day before the trial, an amended petition was filed, stating that there were suspicious alterations and interlineations in the record of the bond, and that Richardson had perpetrated a fraud in giving a false date to said instrument; and in changing the terms and conditions of said bond, stating that they do not believe any bond was executed, and objecting to the reading of the copy from the record. There was no affidavit to this amended petition, so as to put the plaintiff on proof of the bond.

The affidavit of Andrews was a sufficient compliance with the statute, at all events, to authorize the admission of the copy as evidence in his behalf.

The averments of the amended petition do not amount to

a charge of the forgery of the bond, and are too indefinite to present such an issue.

As to the alleged suspicious interlineations, &c., it does not appear that any existed in the record of the bond, made after proper authentication, and certainly the record does not present such evidence on the subject as enables us to see that any error was committed.

Another question is made over an agreement made in 1856 between Andrews and Hutchins on the one part, and one Townsend on the other, by which he agreed to place tenants on and hold possession of the land for them for five years. There is nothing to show that this agreement contemplated any concealment or fraud, or that the possession was to be taken in such a way as should not attract notice. The titles of Hutchins and Andrews were on record, and gave notice of their claim; and they had a right to place tenants on the land, without placing on record the lease or agreement under which the tenants occupied.

With reference to the subject of limitations, our opinion is, that the record does not show that such steps were taken as stopped the running of limitations, as between the original plaintiffs and defendants, until the issuance of process; and that certainly the additional defendants had the benefit of limitations up to the time when they were made parties.

We will dismiss other questions discussed with the remark, that whilst there is manifest error in the charge of the court confining the benefit of the three and five years' limitations to one holding himself during the entire period, this error was in favor of appellants, and that the only material error entitling appellants to a reversal is the one first discussed. For that error, the judgment is reversed and the cause remanded.

REVERSED AND REMANDED.