**CADDELL et al. v. LUFKIN LAND & LUMBER CO. et al.  (No. 341–3714.)** *

(Commission of Appeals of Texas, Section B. Nov. 7, 1923.)

**1. Husband and wife ⬥═252—Land granted to colonist community property.**

Land granted to a married man as a colonist became community property.

**2. Husband and wife ⬥═273(4), 276(6)—Wife's half of community vests in her on husband's death, subject to community debts; community property may be sold to pay debts.**

On husband's death, surviving wife's half of the community property vested in her, subject to the payment of the community debts, and the husband's administrator or executor had power to sell the community property in order to pay such debts.

**3. Husband and wife ⬥═276(6)—Community debts presumed in support of executor's deed 30 years after execution.**

The existence of community debts will be presumed in support of the validity of the executor's deed of community property, executed pursuant to the express power given by the will to sell the property for the payment of debts, in an action involving the validity more than 30 years after execution thereof.

**4. Executors and administrators ⬥═29(4)—Executor's deed not subject to collateral attack.**

Validity of executor's deed cannot be questioned collaterally on the ground that the executor failed to file the statutory oath of office.

**5. Executors and administrators ⬥═25—Failure to file oath mere irregularity.**

Executor's failure to file statutory oath of office was a mere irregularity, and did not affect the inherent validity of his acts.

**6. Depositions ⬥═100—Deposition not taken in case at bar not admissible.**

Under Rev. St. § 3677, a deposition not taken in the case at bar was not admissible.

**7. Deeds ⬥═114(5)—Conveyance of "upper half" of league construed.**

Deed conveying the "upper half" of a league extending back from the river which had been divided by the original grantee into two halves by a line extending from the river *held* to convey the half fronting on the river, which was uppermost with reference to the flow of the river, and which also corresponded with the upper half with reference to the map, in view of the field notes.

**8. Deeds ⬥═38(4)—Deed held not void for uncertainty of description.**

Deed conveying the "upper half" of a league extending back from the river, which had been divided by the original grantee into two halves by a line extending from the river *held* not void for uncertainty, in view of field notes showing the half intended to be conveyed.

Error to Court of Civil Appeals of Ninth Supreme Judicial District.

Action by H. B. Caddell and others against the Lufkin Land & Lumber Company and others. Judgment for defendants was affirmed by the Court of Civil Appeals (234 S. W. 138), and plaintiffs bring error. Affirmed.

T. M. Kennerly, of Houston (O. S. Parker, of Beaumont, and Fred L. Williams and Kennerly, Lee & Hill, all of Houston, of counsel), for plaintiffs in error.

G. P. Dougherty, of Houston, T. L. Foster, of Beaumont, and Mantooth & Collins, of Lufkin, for defendants in error.

McCLENDON, P. J.  This was an action in trespass to try title involving the Andrew Caddell league of land in San Augustine county. Certain small portions of the league were eliminated by agreed judgment in favor of some of the defendants. As to the balance of the league, defendants recovered judgment against the plaintiffs upon a directed verdict, and this judgment was affirmed by the Court of Civil Appeals. 234 S. W. 138.

The plaintiffs were the heirs at law or grantees under the heirs at law of Andrew Caddell and his wife Rhoda. Defendants claim under a deed executed by Andrew Caddell to David Brown conveying the "upper half" of the league, and a deed by the independent executor of Andrew Caddell conveying the other half to F. L. Johnson. Plaintiffs contend that the deed to David Brown, which conveyed the "upper half" of the league was either void for uncertainty in description of the land conveyed, or presented a case of latent ambiguity, in which latter event it was a question of fact for a jury as to which half league was conveyed. The executor's deed is assailed upon several grounds which may be summarized as follows: There was no affirmative proof of the existence of community debts, a prerequisite to the power of the executor to sell community property; the time between the death of the testator and the execution of the deed was so great that the presumption was raised that all debts were barred by limitation; the power of the executor to sell community property expired with the death of the surviving wife; the record in administration did not show that the executor had qualified by taking the required oath.

The controlling facts in the case follow:

[1] Andrew and Rhoda Caddell were married some years prior to 1827. Andrew died in 1869 and Rhoda in 1879, never having married again. The land was granted to Andrew Caddell as a colonist on April 14, 1835, and was therefore community property. The field notes of the original grant, omitting bearing trees for the several corners, read:

"Situated on the northeast margin of the Angelina river; on which margin the first landmark, formed of a mound of earth around a stake, was raised; thence north 26° east

10,712 vrs.; thence north 46° west 2,105 vrs.; thence south 26° west 1,092 vrs.; thence north 46° west 400 vrs.; thence south 26° west 8,363 vrs.; thence following said river along its meanders downward to the first landmark."

On June 23, 1837, Andrew Caddell, in consideration of $1,000 cash, conveyed the "upper half" of the league to David Brown. This deed was placed of record in San Augustine county the following day. The description in the deed, omitting calls for bearings, was as follows:

"A certain tract or parcel of land containing one-half league more or less, lying and being in the county and republic aforesaid, lying on the northeast side of the Angelina river, and known as the upper half of said Caddell league or survey.

"Beginning at a stake on the northeast boundary of Caddell's survey; thence S. 26° W. 1,092 vrs. to second corner; thence N. 64° W. 200 vrs. third corner; thence S. 26° W. fourth corner on bank of Angelina river; thence with the meanders of the river to the fifth corner; thence N. 26° E. to the place of beginning, containing one-half league of land more or less, being a part of the headright, it being the upper half of the said Andrew Caddell's."

On December 25, 1838, David Brown conveyed to M. S. Miller:

"All that certain tract or parcel of land situated in the county aforesaid, and on the northeast side of the river Angelina, the northwest half of the Andrew Caddell league of land which was granted him by the Governor of the state, by which title it belonged to him and by him was sold to the aforesaid David Brown, and by him now to the aforesaid Mathew Simpson Miller, a more particular description may be had by reference to the original now in the archives of the state."

Subsequent deeds of those claiming under M. S. Miller refer to the land as the northwest half of the league.

On January 28, 1863, Andrew Caddell executed a will, in which he recited that he had given to his five eldest sons, naming them, "the amount that I calculate them to have at present." To the wife and children of Joseph D. Caddell he gave $100; to Robert J. Caddell $300; to Newton Marion Acney $300 "apportioned toward raising and educating him"; to Martha E. Sparks $300; and to Richard M. Caddell $800. (Each of the beneficiaries were children of Andrew Caddell except Acney, who was the son of his deceased daughter, Sarah.) After providing for these specific legacies, the will reads:

"For the above request there shall be lands or other property sold to raise that amount of money, and then the balance of the property left shall belong to my wife, Rhoda Caddell, so long as she lives and then I want the amount if any left to be equally divided amongst the heirs, with the exception of the land where I now live, which lyes on the Lampasas, that tract or parcel of land at the death of his mother shall be the property of John C. Caddell."

John C. Caddell was named as executor, the will providing:

"I hereby direct that no other action shall be had in the county court or other court having jurisdiction over the settlement of estates of deceased persons in relation to the settlement of my estate than the probate and registration of this will and the return of an inventory of my property and I further direct that my said executor shall give no bond or security for the execution of this will unless he voluntarily elects to do so, and in order that he may be wholly unembarrassed in the settlement of my estate and be able to close it with the least expense and to the best advantage it is my desire that he shall sell property without orders of court and on such terms as he may deem best so far as the same may be necessary for the proper execution of this will, and shall settle and adjust debts due to and owing by my estate in such manner and on such terms as to him may seem best."

This will was probated at the December term, 1869, of the county court of San Augustine county, and J. C. Caddell was confirmed as executor of the estate, appraisers were appointed, and inventory and appraisement filed and approved. The appraisement shows various items of personal property and several tracts of land, all valued at $3,249.25. The personal property was valued at $729.25. Included in the real estate was 2,214 acres out of the Andrew Caddell grant in San Augustine county, valued at $1,107. So far as the record shows nothing further appears in connection with the estate until the July term of court, 1876, when a supplemental inventory was filed and approved, listing 177 acres of land in Young county, which was appraised at $177. The order approving this inventory begins by reciting that "On this day came on to be heard the petition of John C. Caddell, executor of the estate of Andrew Caddell, deceased, for the appraisement," etc.

On December 23, 1879, Rhoda Caddell executed an instrument reading as follows:

"Know all men by these presents, that whereas Andrew Caddell, deceased, late of Bell county, Tex., before his death made and published his last will and testament, wherein he willed and bequeathed to John C. Caddell, of said state and county, his homestead place in Bell county, now therefore I, Rhoda Caddell, surviving widow of said Andrew Caddell, deceased, do hereby recognize the provisions in said will to be just, and I do hereby declare it to be my intention to forever abide by the provisions of the same."

Deeds were offered showing that John C. Caddell, as executor, had made the following conveyances prior to the deed under which defendants claim: On February 15, 1877, 10 acres of land in Bell county to J. H. Burnett for $100; on April 30, 1877, 212½ acres of land in Nacogdoches county for $275. There were several deeds by the executor after the

deed in question, the last of which was executed on February 11, 1884. The testimony showed that the executor died in 1884.

The deed from John C. Caddell, executor, under which defendants claim, was executed on October 26, 1881, and recorded in San Augustine county on February 20, 1882. F. L. Johnson was the grantee. The recited consideration was $2,214 cash, and the land described was 2,214 acres "in the east half of one league of land granted to Andrew Caddell, bounded on the east by the Galloway league, and on the south by the Angelina river, and on the west by the half of the Caddell transferred by Andrew Caddell to David Brown."

Defendants showed a regular chain of title under the grantees in the deeds from Andrew Caddell to David Brown, and from the executor to Johnson. There were quite a number of deeds in this chain of title, all of which were seasonably recorded in San Augustine county.

The tax records covering the league of land from the year 1869 to the date of trial were introduced in evidence, showing that no one connected with plaintiffs' chain of title ever paid any taxes upon the property during those years, except John C. Caddell, who paid taxes from 1869 to 1881, with the exception of the year 1877. From 1881 to the date of trial the taxes were paid by the defendants or those under whom they claim.

No evidence was introduced, other than what might be presumed from the records above outlined, tending to prove or disprove the existence of debts of the community estate of Andrew and Rhoda Caddell.

We will first consider the questions which relate to the independent executor's deed conveying the southeast half of the league to Johnson.

The Court of Civil Appeals, in addition to holding such deed in every respect valid as passing not only Andrew Caddell's individual interest in the land but also the community interest of his wife, further held that the will of Andrew Caddell attempted to dispose not only of his interest in the community property but also that of his wife; that the latter was put to an election as to whether she would take under the will, and that her election was expressed in the instrument above set out. We have serious doubt whether the will can be interpreted as attempting to pass Mrs. Caddell's interest in the community property. Independently of this holding, however, we are clear in the view that the Court of Civil Appeals reached the correct decision of the case, and we find it unnecessary to construe the will in this regard.

The questions which control the proper disposition of the case we think are so well settled in this state that an extended review of the authorities is unnecessary.

[2] Upon the death of Andrew Caddell his surviving wife's half of the community property vested in her, subject to the payment of community debts. It is hardly probable that there were any debts owing by Andrew Caddell which were not debts of the community, since he had been married for about 50 years. If there were community debts, unquestionably his administrator or executor would have the power to sell the community property in order to pay them. It is not necessary to cite authority upon this question. It has been repeatedly held in this state that the existence of a power under which a conveyance is executed, as well as the existence of facts essential to the validity of a conveyance executed under a power duly established, will be at least prima facie presumed after the lapse of 30 years from the time the conveyance under the power was executed, provided, of course, the conveyance is established as an ancient instrument. Veramendi v. Hutchins, 48 Tex. 531; Box v. Word, 65 Tex. 166; Hensel v. Kegans, 79 Tex. 347, 15 S. W. 275; Auerbach v. Wylie, 84 Tex. 615, 19 S. W. 856, 20 S. W. 776; Spear on Marital Rights in Texas, section 582. The following is quoted from Hensel v. Kegans:

"The rule is familiar, and has been repeatedly recognized in our state that the power to execute a deed will be presumed generally in those cases where the conveyance would be evidence as an ancient instrument without proof of its execution, and purports to have been executed under a power. Since the case of Watrous v. McGrew, 16 Tex. 506, it has been frequently referred to with approval. In Veramendi v. Hutchins, 48 Tex. 531, it was said in effect that the presumption might obtain, in the absence of proof to the contrary, after a sufficient lapse of time, that the facts existed in that case which authorized the sale of the community property by the survivor of the community—in that case the husband. The reason upon which the rule is founded that the power will in such cases be presumed is the difficulty of producing direct proof of such power. This reason, we think, applies with greater force in a case like the present than in those cases where the power is presumed in support of a deed purporting to be executed by a power, because in the cases last mentioned the power may itself be a matter of record. In the former, the facts presumed to exist authorizing the sale, and which are analogous to the power presumed, exist in parol. Id. In the cases cited it was said that 'after the lapse of nearly 40 years it is not to be expected that direct evidence can be produced of the existence of community debts.'"

There is the additional circumstance in the present case that Andrew Caddell in his will gave the express power to his executor to sell his property without order of court and pay his debts. This express power was in addition to the power previously expressed to sell property for the payment of specific legacies. The case of Terrell v. Mc-

Cown, 91 Tex. 231, 43 S. W. 2, is direct authority for the proposition that, where an express power of sale to pay debts is given to an independent executor, it will be presumed that there were debts which would be essential to the execution of the power, the executor having acted under the power. The following quotation from that case seems to us to be decisive of this question:

"It is fair to assume that the testator knew the condition of his business, and was in a position to form some idea as to what would be necessary to be done by the executors in the administration of his estate, and he having, in the will, which speaks as of the date of his death, conferred the power to sell to pay his debts, it would be against reason not to assume, at least prima facie, that there were debts to support such power. Otherwise we begin the task of construction with the assumption that he did an unnecessary and unreasonable thing in inserting the second subdivision above quoted in his will; for if the burden be upon the purchaser to show debts before he can claim under such power, then that clause conferring the power becomes wholly nugatory, since it is clear that where the will appoints an executor, but makes no provision for power of sale and provides for administration outside of the probate court, and the proof shows the existence of debts, the law implies a power of sale as necessary to a carrying out of the general intent of the testator that the administration should be independent of the orders of the court. The testator probably considered that under an express power of sale conferred by the will his executor could sell property to a better advantage than if compelled to resort to such powers as the law might raise by necessary implication. He had the right to prevent his estate being depreciated in value in the hands of his executors by placing their power of sale beyond doubt, and, having done so, the courts have no right to practically nullify his wise precaution by imposing upon the purchasers the burden of showing the existence of debts before they can claim under such power. So long as it is the policy of the lawmaking power to permit a testator to provide for the administration of his estate by his trusted friends independent of the courts, instead of allowing it to drift into the hands of merciless creditors or designing strangers through the forms of an administration in the probate court, so long should the powers expressly conferred by the will be upheld."

[3] In the present case the executor's deed was made in 1881, and recorded in 1882 in the county where the land was situated. The purchaser under that deed, shortly after its execution, conveyed to others, and the property passed from one grantee to another successively until suit was brought in 1915, some 33 years after the executor's deed was spread upon the public records, and over 30 years after the executor's death. During all this time, those holding under the executor's deed had paid the taxes upon the property, and no claim was asserted by the plaintiffs or their predecessors in title to any part

of the land. It is clear under the authorities that in the absence of a showing to the contrary by those seeking to avoid the deed, the existence of community debts will be presumed.

What has been said disposes of the contention that whatever debts might have existed at the death of Andrew Caddell were barred by limitation at the time the executor's deed was executed. The record shows that this deed was executed in 1881, some 10 years after the will was probated. The executor had the power in the management of the estate to extend the time of payment of community obligations by renewal; and, even if this power had not existed, we think the time between the probating of the will and the execution of the deed is not so great as to raise any presumption that community debts were barred. The record shows, as stated above, that the administrator made no sales of property until 1877. In the previous year he had gone into the probate court and filed and had approved supplemental inventory. After the sale in question he made a number of other sales, the validity of which so far as the record shows was not questioned. There is nothing, we think, in the lapse of time between 1869 and 1881 to raise any presumption that community debts were barred, and this is especially true in view of the fact that for over 30 years the executor's deed was upon the public records, unquestioned by any one interested adversely to it, and acted upon repeatedly by conveyances under it.

The contention that the executor's powers over the community interest of the wife expired upon her death is wholly without merit. The wife's title to one-half of the community estate was subject to community debts, and her death could have no effect whatever upon those debts or the powers of the husband's administrator or executor to subject her community interest, as well as that of her husband, to their payment.

[4, 5] We do not think the validity of the executor's deed can be questioned collaterally, on the ground that the executor failed to file the statutory oath of office. The purpose of the oath appears to be twofold. The executor's affidavit that the will offered by him is, so far as he knows or believes, the last will of the testator, might become important, as affecting the bona fides of purchasers under the executor, if a later will were discovered, and the first will set aside. But no question of this character could possibly arise in the present case. The affidavit that the executor will faithfully perform the duties of the trust adds nothing in law to the binding effect of those duties, but merely evidences an acceptance of the trust, and an assent to be bound. The acceptance of the trust by the executor, either expressly or impliedly, imposes upon him all the duties

which he would assume by making the statutory affidavit; and where he acts under the will as executor he cannot relieve himself of the responsibility for his acts by showing that he had not taken the required oath. Failure in this regard was a mere irregularity, and did not affect the inherent validity of his acts. See Connellee v. Roberts, 1 Tex. Civ. App. 363, 23 S. W. 187, and Patten v. Cox, 9 Tex. Civ. App. 299, 29 S. W. 182.

[6] Plaintiffs offered in evidence copy of a deposition of Andrew B. Caddell, a son of Andrew Caddell, taken in a case in the federal court at Beaumont, in which "Henry Caddell et al." were plaintiffs and "George E. Downs et al." were defendants, in which deposition deponent testified that he knew the condition of his father's estate, and that at the time of his death he owed no debts. It was shown that Andrew B. Caddell had died since the deposition was taken. Defendants objected to the deposition, because it was not taken in the case at bar. The objection was well taken, and was properly sustained. R. S. § 3677; Bank v. Mulkey, 94 Tex. 395, 60 S. W. 753; Martinez v. Bruni (Tex. Com. App.) 235 S. W. 549; Id. (Tex. Civ. App.) 216 S. W. 655; Rucker v. Carr (Tex. Civ. App.) 163 S. W. 632; Castleberry v. Bussey (Tex. Civ. App.) 166 S. W. 14; Dawedoff v. Hooper (Tex. Civ. App.) 190 S. W. 522.

We pass now to the objections urged to the deed from Andrew Caddell to David Brown. The deed itself leaves certain matters free of any controversy. In the first place, it is clear that the grantor intended to convey one-half of the grant by quantity, whether that one-half constituted more or less than half a league. In the second place, the dividing line between the two halves was parallel with the lines terminating on the bank of the Angelina river with the course beginning at the river north 26° east, thus dividing the league into northwest and southeast halves. And in the third place, the grantee was to have the "upper half," whatever that term may signify. The only possible uncertainty in the description is the meaning to be given that term.

There are but three possible constructions to be given to the expression "upper half." It might refer to the course of the river, the position on the map, or the topographical elevation. The Angelina river where it forms the southwest boundary of the league runs in a southeasterly direction. If the league is platted on a map and divided by a line parallel to its northwest and southeast lines, the upper half, according to the map, will be the northwest half, corresponding with the upper half with reference to the flow of the river. The evidence showed, as found by the Court of Civil Appeals, that generally speaking the southeastern half of the league was higher in elevation than the northwestern

255 S.W.—26

half, and that the drainage was from the southeastern to the northwestern half into a creek which flowed into the Angelina river. Consequently, if the words upper half refer to elevation, the southeast half would more nearly correspond to the description "upper half" than would the northwest half. From the field notes of the deed to David Brown it is to be observed that one of the calls is missing. The beginning call is on the northeast boundary of the survey. The second call is identical in course and distance with the call in the original grant from the northeast corner of the league. The third call is the same course as the next corresponding call in the grant, but the distance, 200 varas, is only one-half the distance called for in the grant. The next call corresponds in course with the corresponding call in the grant, and terminates as does that call in the grant on the bank of the Angelina river. No distance is given. The next call follows the course of the river downward. The next or last call would coincide, either with a line drawn through the center of the league from a point on the river parallel to the northwest and southeast league lines, or with the southeast league line. We have omitted the bearing trees both in the grant and in the deed, for the reason that they throw no light on the controversy. Defendants contend that the beginning point in the deed was the northeast corner, and that the call for 200 varas in the second call, instead of 400 varas as in the grant, was a mistake, and that the last call in the deed was a single unbroken line beginning at the river parallel to the northwest and southeast league lines. Plaintiffs contend, on the other hand that the beginning point may as consistently be placed approximately at the center of the northeast league line, extending thence south 26° west 1,092 varas; thence north 64° west 200 varas; thence south 26° west to the river, thus making the division line correspond with the northwest lines of the league with an offset just one-half the length of the offset in the northwest league lines.

[7] We have reached the conclusion that the Court of Civil Appeals correctly held that the expression "upper half," as applied to the physical facts, meant the half fronting on the river which was uppermost with reference to the flow of the river which would also correspond with the upper half with reference to the map.

[8] The cases most strongly relied upon by plaintiffs to sustain their contention that the deed is absolutely void for uncertainty are Harris v. Shafer, 86 Tex. 314, 23 S. W. 979, 24 S. W. 263, and Beze v. Calvert, 2 Tex. Civ. App. 202, 20 S. W. 1130. Neither of these cases, in our opinion, sustains this contention.

In the Beze Case the court was construing

a sheriff's deed, and in the opinion advert to the rule that "less indulgence will be shown in favor of descriptions of property contained in deeds based on compulsory sales under judicial process than applies to descriptions given in deeds and other instruments voluntarily executed by the owner of the property." The deed in that case was palpably so indefinite in other respects as to render impossible the location of the tract conveyed, that the reference in the opinion to the expression "upper half" may well be disregarded as surplusage. The instrument in Harris v. Shafer was an administrator's deed, which conveyed 1,800 acres of land "it being the upper part of the survey." This description was held to be too indefinite, since there was no way of determining just how the 1,800 acres were to be surveyed. In the case of Lunn v. Scarborough, 6 Tex. Civ. App. 15, 24 S. W. 846, the land described was "the western half of 1,000 acres deeded to Lewis M. Nail by Joseph Nail, dated the 28th day of November, A. D. 1853; the same to be surveyed so as to contain 500 acres in the upper end of said 1,000 acres of land." This description was held to present at most "a case of latent ambiguity." We quote the following from the opinion in that case:

"We cannot say that the land described by the metes and bounds in the petition is not within the above description. The evidence tended to show that it is. It may be conceded that, in the absence of special circumstances modifying or changing its meaning, the word 'upper,' when used to describe a part of a survey of land made and platted upon a map, would naturally suggest the north part of such survey; seeing that surveys and maps are made with reference to the points of the compass. At the same time it is also common knowledge that rivers do not respect the points of the compass, but all run down to the sea. As this survey is situated on the river, its description (including the word 'upper') should be read in the light of this fact; and, when so read, we apprehend all seeming ambiguity will vanish away."

The case at bar is in many respects similar to the case of Swisher v. Grumbles, 18 Tex. 164. There, as here, the upper half of a survey fronting on a river was conveyed, and it was held that the upper half meant the half up the river. In the present case we have a league 2,505 varas wide extending back from the river between parallel lines some 10,000 varas. It is divided by the original grantee into two halves by a line extending from the river parallel to these side lines. The river is the only natural object of any permanency mentioned in the original grant or in deed to Brown. Obviously the league was divided by the grantee with reference to the river, and with an evident purpose to give the two halves, as thus divided, approximately the same river front. We know, as a matter of history, that many grants were located with reference to rivers, a very obvious natural advantage, which was recognized by laws prohibiting the crossing of rivers by league lines. We have been cited to no case wherein the expression "upper half" or "upper part" of a tract of land has ever been determined to be the more elevated part, and we think it would be an unnatural and strained construction of the expression in the present case. The call in the deed for 200 varas instead of 400 as in the corresponding league line we think is unimportant.

If there were any substantial doubt as to what was meant by the grantor in the expression "upper half," such doubt has been clearly removed by the construction placed upon the deed by all parties shown to have any dealing with the land from the time the deed was executed and placed upon the records in 1838 until the bringing of this suit. We find that David Brown, shortly after the conveyance to him, sold the land conveyed, describing it as the northwest half of the grant; and this description is carried into the various deeds of grantees claiming under David Brown. William Caddell lived 30 years after the deed from his grantee, David Brown, to Miller was executed, during all of which time this deed was spread upon the public records of San Augustine county. When the executor of David Brown conveyed the unsold half of the league, he described it as being bounded on the west by the land conveyed by his father to David Brown, thus recognizing the northwest half of the league as being the property which his father had conveyed. If it were permissible now to inquire into the correctness of this description and to hold that the words "upper half" meant the southeast or higher half from the standpoint of elevation, then the executor of William Caddell conveyed to Johnson the same land which William Caddell had previously conveyed to David Brown, and the estate of William Caddell received the benefit of the consideration of this deed. Whether the executor would have the power to bind the heirs or devisees of his testator in his interpretation of his testator's prior deed is not essential. Clearly that deed was not void, but at most could only be said to contain a latent ambiguity. In making a sale of the undisposed of half of the league it was necessary that the executor should determine what the undisposed of half was. In view of the fact that he gave the same interpretation to the David Brown deed that David Brown and his grantees gave to it, and that this interpretation has not been questioned for over 30 years, every doubt, we think, as to the meaning of the expression "upper half," is removed.

It might also be noted that a number of experienced real estate men and surveyors testified on the trial that the expression "up-

per half" with regard to a river survey was generally understood to mean the half up the river. One of these witnesses was called by the plaintiffs to testify concerning the topography of the league. All of this testimony was objected to as incompetent. It was not disputed by any witness. If parol testimony as to the meaning of "upper half" were admissible at all, this testimony further corroborated the theory of defendants that the northwest half of the league was conveyed to David Brown.

It is our conclusion that the judgments of the district court and Court of Civil Appeals should be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.