CADDELL et al. v. LUFKIN LAND & LUMBER CO. et al. (No. 508.)

(Court of Civil Appeals of Texas. Beaumont. June 27, 1921. Rehearing Denied Oct. 12, 1921.)

1. Executors and administrators ⬅7—Sale by independent executor not to be collaterally attacked because of nonshowing as to letters testamentary and oath.

Sale of property by an independent executor as directed by the will is not subject to collateral attack because it did not appear that the letters testamentary were issued to him, or that he filed an oath, the general statutes (Paschal's Dig. arts. 1268, 1279, 1281) relating to requirements of personal representatives giving way to special requirements of article 1371, permitting testator to provide that no action shall be had in the probate court in relation to settlement of estate except the probate and registering of will and return of inventory.

2. Executors and administrators ⬅384—Deed proved by producing it together with orders authorizing and confirming it.

An executor's or administrator's deed is proved by producing the deed and orders authorizing and confirming it, and if the opposing party desires to attack such order because of defects in them he must produce proof of such defects.

3. Executors and administrators ⬅383—Deed not to be attacked because of failure to file oath.

The lack of proof of filing an oath by an administrator c. t. a. or executor acting under order of court would not justify collateral attack on their deeds, though oath be required by statute.

4. Statutes ⬅194—Special provisions control.

Special statutory provisions control those that are general.

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**5. Executors and administrators ⬤⇒7—Will held to give independent executor power to sell.**

Will construed, and *held* to give independent executor ample power to sell land so far as the control of those powers was in the hands of testator.

**6. Homestead ⬤⇒136—Testator cannot confer power to sell homestead except to pay community debts.**

A testator alone is incapable of conferring power to sell his wife's interest in homestead except for payment of community debts.

**7. Executors and administrators ⬤⇒7—On collateral attack of deed of independent executor, presumption held in favor of sale.**

Where an independent executor is authorized by will to sell land to pay debts, and all property is community property, so that there could be only community debts, the presumption on collateral attack of executor's deed would be in favor of those taking under the sale.

**8. Wills ⬤⇒782(13)—Relative to right of election, will held to show an intention to deal with entire homestead.**

Where all property of testator was community property, and there were no debts other than community debts, and the will authorized an independent executor to sell property without order of court so far as the same may be necessary for proper execution of will and the will confirmed advancements made out of the community estate to some of his children, and equalized and adjusted the bequests to others with relation to them, and then devised the balance of the property, not necessary to be sold to pay legacies, to the wife, the will as respects election by wife sufficiently showed an intention to deal with jointly owned homestead as an entirety.

**9. Wills ⬤⇒793—Wife's declaration that will was just disposition of homestead held an election.**

Where testator by his will undertook to give an independent executor power to sell homestead as an entirety, ample provision being made for the wife in respect to property she would not otherwise acquire, the wife was put on her election, and where she executed a document declaring disposition of homestead just, an election takes place, and sale of the homestead could not be collaterally attacked for want of power to sell her interest.

**10. Wills ⬤⇒782(13)—As respects election, will is construed against disposing of wife's property.**

Though testator's will is capable of being construed so as to dispose of wife's interest in homestead, yet to put the wife on election will must be capable of no other construction.

**11. Wills ⬤⇒792(1)—To constitute election, will must give wife new right.**

To constitute an election, the will must have given the wife something that she would not have had but for the will.

**12. Contracts ⬤⇒153—Construed so as to give effect.**

Courts should rather incline to that construction of a document which would give it effect than to one which would make it ineffectual.

**13. Deeds ⬤⇒38(1)—When description invalid as too uncertain.**

If it is apparent on the face of a description of land that it cannot be given any definite location, but may be equally well shifted to varying locations, it is void whether it is a voluntary or involuntary deed, though a voluntary deed might be on a different basis if the question was presented whether or not it could be given effect to convey an undivided interest.

**14. Deeds ⬤⇒119—Construction fixing location question for court.**

If the construction of the description as contained in a deed fixes the location of the property, there is no question of fact to be submitted to a jury.

**15. Deeds ⬤⇒114(1)—Conveyance of upper half of league held capable of being made certain, though one line of description was omitted.**

A deed conveying the "upper half" of a headright league, though uncertain in its description, one line of boundary being omitted, *held* made certain by field notes of original grant and the deed showing that the two halves of the league fronted on a river, and subsequent deed from executor of grantor describing land conveyed as east half showed that the upper half must mean above the river.

Error from District Court, San Augustine County; W. T. Davis, Judge.

Trespass to try title by H. B. Caddell and others against the Lufkin Land & Lumber Company and others. From a judgment entered on a directed verdict for defendants, plaintiffs bring error. Affirmed.

Kennerly, Lee & Hill, of Houston, and O. S. Parker, of Beaumont, for plaintiffs in error.

Baker, Botts, Parker & Garwood, of Houston, Mantooth & Collins, of Lufkin, T. L. Foster, of Beaumont, and W. I. Davis, of Center, for defendants in error.

HIGHTOWER, C. J. This was a suit in trespass to try title brought by the appellants against the appellees herein and a number of other defendants, who were disposed of by the judgment below, and as to the judgment relating to such other defendants, no complaint is made by either party to this appeal. The land involved is the Andrew Caddell league, in San Augustine county, which was granted to Andrew Caddell on April 14, 1835. This league was the community property of Andrew Caddell and his wife, Rhoda Caddell. Andrew Caddell died in the year 1868, and Rhoda Caddell died in December, 1879. Appellees answered by general denial, plea of not guilty, and also interposed the several statutes of limitation, and there were also special answers, unnecessary to mention here. The case proceeded to

trial with a jury, but at the conclusion of the evidence the trial court peremptorily instructed a verdict against appellants in favor of all defendants, and rendered judgment on the verdict so instructed. Thereafter, in due time, appellants filed their motion for a new trial, which being overruled, they prosecuted a writ of error to this court.

Some of the appellants are the children and heirs at law of Andrew and Rhoda Caddell, and others of them base their claim to the land in controversy upon conveyance from other children and heirs of Andrew and Rhoda Caddell. In other words, the claims of the appellants here are based upon descent of themselves and their grantors from Andrew and Rhoda Caddell, and such descent was established, without dispute, on the trial below. The propriety of the peremptory instruction depends first upon the construction and effect of the two following deeds:

(1) A deed from Andrew Caddell to David Brown, dated June 23, 1837, and purporting to convey the "upper half" of the grantor's headright league, which half is also attempted to be described by boundaries from which one line is omitted.

(2) A deed from John C. Caddell, as executor of the will of Andrew Caddell, to F. L. Johnson, dated October 26, 1881, conveying the east or southeast half of the league described as bounded on the west by the east line of the tract conveyed to Brown.

The original grant contains complete field notes, calling for two marked trees, particularly described, at each corner. Omitting these calls for trees, the original grant is described as follows:

"Situated on N. E. margin of Angelina river, on which margin the first landmark was raised; thence N. 26° E. 10,712 varas, and second landmark was reached; thence N. 64° W. 2,105 varas; thence S. 26° W. 1,092 varas; thence N. 64° W. 400 varas; thence S. 26° W. 8,363 varas; thence following the river along its meanders downward to the first landmark, thus completing the league."

Appellees claim the northwest half of this league under the deed from Andrew Caddell to Brown, dated in 1835. Omitting immaterial parts, such as its calls for bearing trees at corners, none of which correspond to any of those called for in the field notes of the original grant, the description in the deed is as follows:

"One-half league, more or less, * * * on the N. E. side of Angelina river, and known as the upper half of said Caddell land or survey; beginning at a stake on the N. E. boundary of Caddell's survey; * * * thence S. 26° W. 1,092 varas to second corner; * * * thence N. 64° W. 200 varas to third corner; * * * thence S. 26° W. to fourth corner on the bank of Angelina river; * * * thence with the meanders of river to the fifth corner; thence N. 26° E. to the place of beginning, containing one-half league of land, more or less, it being a ' part of the headright * * * the upper half. * * *"

Andrew Caddell left a will dated January 28, 1863, by the terms of which his son, John C. Caddell, was made independent executor without bond, and the will directed that "no other action be had in the county court or other court * * * than the probate and registration of this will and the return of an inventory," etc. The will in full is as follows:

"First I have given to my five oldest sons the amount that I calculate them to have at present, which is John C. Caddell, Jeremiah D. Caddell, William J. Caddell, Andrew B. Caddell, and Anthony B. Caddell, and also Joseph D. Caddell, $200.00. I desire his wife and children to have $100 more, and I desire that Robert J. Caddell shall have $300, and Newton Marion Acney shall have $300 appropriated toward raising and educating him and then for Martha E. Sparks to have $300 and then I desire that Richard M. Caddell shall have $800. For the above requests for public lands or other property sold to raise that amount of money, and then the balance of the property left shall belong to my wife, Rhoda Caddell, so long as she lives and then I want the amount if any left to be equally divided amongst the heirs, with the exception of the land where I now live, which lies on the Lampasas, that tract and parcel of land at the death of his mother shall be the property of John C. Caddell.

"I hereby appoint John C. Caddell of the county of Bell, in said state of Texas, my sole executor, to execute this my last will and testament.

"I hereby direct that no other action shall be had in the county court or other court having jurisdiction over the settlement of estates of deceased persons in relation to the settlement of my estate than the probate and registration of this will and the return of an inventory of my property and I further direct that my said executor shall give no bond or security for the execution of this will unless he voluntarily elects to do so, and in order that he may be wholly unembarrassed in the settlement of my estate and be able to close it with the least expense and to the best advantage it is my desire that he shall sell property without orders of court and on such terms as he may deem best, so far as the same may be necessary for the proper execution of this will, and shall settle and adjust debts due to and owing by my estate in such manner and on such terms as to him may seem best."

The will was signed by Andrew Caddell January 28, 1863. It will be observed that the will refers to and confirms certain advancements made to some of Caddell's children; provides for special legacies to be paid to some of them, to be made from sale of lands; and the balance of the property is thereby devised to the testator's wife, so long as she might live, and, if any was left, it was to be equally divided amongst the heirs, with the exception of the homestead in Lampasas county, which, on the death of the widow, was to be the property of John C.

Caddell. It will also be observed that the will directed independent sales and payment of debts. The will was probated in December, 1869, and an inventory filed showing 2,-214 acres of the testator's original grant in San Augustine county (being the land in controversy), and other lands.

The testator's widow, Rhoda Caddell, on December 23, 1879, executed a written document, in which she declared that the testator had made a will, disposing of his homestead to John C. Caddell, and 'she "recognized the provisions of said will to be just" and declared it to be her "intention to forever abide by the provisions of same." The written declaration in full is as follows:

"The State of Texas, County of Bell.

"Know all men by these presents, that whereas Andrew Caddell, deceased, late of Bell county, Texas, before his death made and published his last will and testament, wherein he will and bequeathed to John C. Caddell of said state and county his homestead place in Bell county, now therefore, I, Rhoda Caddell, surviving widow of said Andrew Caddell, deceased, do hereby recognize the provisions in said will to be just, and I do hereby declare it to be my intention to forever abide by the provisions of same."

The order admitting Andrew Caddell's will to probate also approved the inventory filed by his executor. There was no proof offered as to whether letters testamentary were ever issued to the executor, nor whether any oath was filed by him such as the general provisions relating to executors and administrators require. The homestead referred to in the will was acquired by Andrew Caddell and his wife jointly by deed of gift from their son, John C. Caddell, dated in 1862. All the other property of the estate was community property, including the league of land in controversy, or any part of same remaining unsold. John C. Caddell, acting as executor of the will, made conveyances of several different tracts of land belonging to the estate, and among them, the second deed above mentioned, which is described in the brief of appellants as follows:

"Deed, John C. Caddell, as executor of will of Andrew Caddell, to F. L. Johnson, October 26, 1881, filed February 20, 1882. In consideration of $2,214, paid by F. L. Johnson of Shelby county, conveying 2,214 acres of land in the east half of one league of land granted to Andrew Caddell, bounded on the east by the Galloway league and on the south by the Angelina river and on the west by the half of Caddell transferred by Andrew Caddell to David Brown."

[1] By the first proposition under appellants' first assignment of error, they assail the peremptory instruction on the ground that, since no letters testamentary were shown to have been issued to John C. Caddell, therefore his deed as executor could not be upheld.

In support of this contention, appellants cite the case of Werbiskie v. McManus, 31 Tex. 122, and that of O'Neal v. Tisdale, 12 Tex. 41. These cases have had our most careful consideration. They were cases in which the question of authority to sue as administrator or executor, acting under orders of court, was raised by defendants, who demanded proof of authority before being required to defend. In one of them the appointment of an administrator de bonus non had been made; but he had not yet given bond; in the other, both bond and oath had been made, but letters were withheld for nonpayment of a federal tax. In each case the party offering to sue lacked some of the necessary legal qualifications to sue as representative of the estate, in the view of the court.

In a supplemental argument, appellants refer to the general statutes relating to executors and administrators, as requiring not only the issuance of letters, but the filing of an oath of office by the executor, and they argue that this is an important and material requirement, because in no other way could it be made to appear that the executor does not know of a later will.

[2] The usual rule for proving an ordinary executor's or administrator's deed is to produce the deed and orders authorizing and confirming it, and if the opposing party desires to attack such orders, because of defects back of them, he must produce the proof of such defects, remembering that a purchaser "was not required to look beyond the orders of a court of general jurisdiction." Guilford v. Love, 49 Tex. 738, overruling several decisions to the contrary.

[3] The lack of proof of such oath in the case of an administrator with will annexed, or executor acting under orders of court, would not have justified a collateral attack, though the oath was, in their cases, expressly required. How, then could it justify attacks on the acts of an independent executor when both the will and the statute limit his requirements to filing an inventory? The nature of the trust, both under the act of 1862 (Acts 1862, c. 25) and the present statute seems to require that the acts of an independent executor be upheld as against collateral attack when performed in accordance with provisions of the will, and after the probate and registration of the will, even though they precede his compliance with the express statutory requirement of filing an inventory. Patten v. Cox, 9 Tex. Civ. App. 299, 29 S. W. 183; Connelle v. Roberts, 1 Tex. Civ. App. 363, 23 S. W. 187.

[4] Since the Act of January 1, 1862 (P. D. art. 1371), it has been permissible for a testator to provide that—

"No other action shall be had in the probate court in relation to the settlement of his estate except the probating and registering of his will and the return of an inventory of the estate."

There is, no doubt, good reason in the argument stated for adding the filing of an official oath to these exceptions; but it cannot, under the law as it now exists, be required as a condition of the validity of his acts or deeds, because he does not act by virtue of official appointment under letters of administration, but by virtue of confidential appointment and powers contained in the probated and registered will. The court has no power to give to any one such authority as is given by wills of the class here under consideration. Langley v. Harris, 23 Tex. 569. There are provisions of statute relating to the probating of wills in general, calling for letters testamentary (P. D. art. 1268), oath of office (article 1279), and bond (article 1281); but these are general provisions, having reference to a judicial administration under the directions of the will, and they give way to the special provisions above cited (P. D. art. 1371), having reference to the execution of the powers of the will by one who is charged with a strictly personal trust by the testator. For the rule is that special provisions control those that are general. Howard Oil Co. v. Davis, 76 Tex. 630, 13 S. W. 665.

This question was passed upon in an opinion by Judge Head in Connelle v. Roberts, supra, among other things, the court there saying:

"We are therefore of the opinion that the court below erred in treating the taking of an oath by an independent executor as essential to his legal qualification as such. We do not wish, however, to be understood as intimating that, even if the law required such executors to qualify by taking an oath, the failure to comply with such provision would be fatal to his acts when called in question collaterally, as in this case."

By the second proposition under the first assignment of error, appellants contend that the deed of John C. Caddell could not take effect as to any interest beyond his own, because of lack of power to sell the land of the estate of the testator at the time he sold; and by the third proposition, appellants contend that the testator could not, by such will, authorize disposal of the interest of a surviving wife.

[5, 6] The powers conferred by the will were, in our opinion, ample to authorize sale of the land in question, so far as the control of those powers was in the hands of the testator. Terrell v. McCown, 91 Tex. 231, 43 S. W. 2. But the question of power to convey the community half interest of the widow, Rhoda Caddell, is more difficult of solution. There can be no question but what the testator, alone, was incapable of conferring power to sell his wife's interest, except for payment of community debts. And the burden ordinarily would be on the defendants to show, either by direct or circumstantial evidence, the existence of such debts (Roy v. Whitaker, 92 Tex. 357, 48 S. W.

892, 49 S. W. 367; Moody v. Butler, 63 Tex. 210) if they relied upon the existence of such debts to give effect to the conveyance of the widow's half interest. That at least would be so in a case where the wife's interest had already vested in her heirs by her death before that of her husband. But a distinction is made in those cases where the husband's death occurs during the continuance of the community affairs, and while the sole direction thereof is in his hands. The Commission of Appeals, with approval of the Supreme Court, in the case of Waterman Lumber Co. v. Robbins, 206 S. W. 825, after reviewing Roy v. Whitaker and Moody v. Butler, said:

"In other words, these cases in effect hold that when the wife dies, leaving the husband surviving, her community interest vests at once in her children, charged, of course, with the payment of community debts, and that the subsequent death of the husband and the granting of administration upon his estate does not confer jurisdiction over the estate of the heirs. In such case, the husband's administrator has the same power that the husband possessed, which is the power to sell only for the purpose of paying debts which are proper charges against the property. These cases, in our judgment, do not control the case under consideration. Here the husband died almost two years before the wife, and under the rule announced in Hollingsworth v. Davis, 62 Tex. 438, Moke v. Brackett, 28 Tex. 443, and Lawson v. Kelley, 82 Tex. 463, 17 S. W. 717, upon the appointment of the administrator of the husband the entire community estate passed under the jurisdiction and control of the probate court. Having such jurisdiction, the judgment of the court in authorizing and confirming a sale of the property is, in our opinion, conclusive."

The case referred to was that of an administrator's act, under orders of the court. But it seems to us that an independent executor would have equal power over the community estate for the payment of debts. As said in Roy v. Whitaker, supra, in reference to an independent executor, and his payment of debts and distribution of the estate:

"With reference to such matters, the executor can do whatever the court could authorize to be done if the estate was under its entire control."

See, also, Carlton v. Goebler, 94 Tex. 93, 58 S. W. 829, where it was said:

"We think that the appointment of an executor with a direction in the will that 'no other action shall be had in the county court in relation to the settlement of his estate than the probating and recording of his will and the return of an inventory,' etc., without other provisions either enlarging or restricting his powers, confers upon him authority to do, without an order of court, every act which an administrator could perform with such order. Such is the established rule under our statutes; and hence if an administrator, by virtue of an order of the county court, can sell community

property to pay community debts, no reason suggests itself why an independent executor cannot do the same without an order."

The opinion in Waterman Lumber Co. v. Robbins, dealing with a sale under orders of court, said:

"If the existence of debts was a condition precedent to the power of the court to authorize the sale of the property, we think it must be conclusively presumed in this collateral proceeding that the court found this necessary fact before ordering the sale of the property."

[7] In this case, Andrew Caddell, by his will, expressly empowered and authorized his executor to sell lands and to' pay his debts. There could have been none but community debts; the presumption, therefore, is in favor of those taking under the sale. The question is thus disposed of by Judge Denman's opinion in Terrell v. McCown, supra:

"Here the power to sell is expressly conferred by the will; and since it is not necessary to resort to implication to raise the power, it cannot be necessary for the claimant thereunder to establish by proof any of the conditions upon which the law would raise such implication. It is fair to assume that the testator knew the condition of his business and was in a position to form some idea as to what would be necessary to be done by the executors in the administration of his estate, and he having, in the will, which speaks as of the date of his death, conferred the power to sell to pay his debts, it would be against reason not to assume, at least prima facie, that there were debts to support such power. Otherwise we begin the test of construction with the assumption that he did an unnecessary and unreasonable thing in inserting the second subdivision * * * in his will. * * *

"The burden of proof, then, being at all events upon plaintiffs and interveners, to show the termination of the power of sale by the payment of the debts previous to the sales of this land, the finding of the Court of Civil Appeals above referred to, that the evidence failed to show the nonpayment of the judgment, when taken as true, does not show that Willis' power to sell had terminated and therefore would not justify us in reversing the case on the facts."

It is conceded that what is said above has reference only to those cases in which there is no evidence one way or the other as to the existence of debts, and plaintiffs in this case tendered depositions of a son of the testator to the effect that the testator owed no debts at the time of his death. The tendered deposition was taken in another case, however, and the tender was made in this case because of the death of the witness, but the deposition was excluded on objection of appellees, and the action of the court in that regard is here complained of by appellants. We do not deem it necessary, however, to pass on that contention, nor that presented by the counterproposition of appellees raising the question of the right in appellants to recover where they and appellees each prove an undivided interest and that of appellants was not definitely ascertainable from the evidence.

[8, 9] Irrespective of the question of the right in the executor to sell the land to pay community debts, we are of the opinion that the will of Andrew Caddell had the effect to put upon his widow, Rhoda Caddell, the necessity of electing whether she would confirm its provisions, with the possible benefit to herself from the residuary devise of the entire estate, thereby made to her for her life, or repudiate same and hold on to her absolute statutory right to just one-half of the estate; and it is our opinion that, by her written declaration hereinbefore quoted, she clearly elected to accept under the will. In such a case, the act of the testator combines with the act of the surviving wife to give to the executor power, not only to sell for the purpose of paying debts, but also for the purpose of paying special legacies under the will.

It is clear, we think, that the testator—leaving no debts except what were necessarily community debts, and directing his independent executor to sell property and pay debts (Carlton v. Goebler, supra), and confirming advancements made out of the community estate to some of his children, and equalizing or adjusting the bequests to others with relation to them, and expressly dealing with the jointly owned homestead as an entirety—intended to put the entire joint estate of himself and wife in the hands of the executor, and that the widow, knowing that such intention had been shown by the will, intended to confirm it.

[10] The rule in regard to election under such a will has been stated as follows:

"If susceptible of such construction the language of the testator ought to be held to refer to his own interest in the community property rather than to the entire property owned in common by husband and wife." Avery v. Johnson, 108 Tex. 294, 192 S. W. 542; Smith v. Butler, 85 Tex. 126, 19 S. W. 1083; Crosson v. Dwyer, 9 Tex. Civ. App. 482, 30 S. W. 932.

The rule is thus clearly stated by Chief Justice Phillips in Avery v. Johnson, supra:

"Therefore, for a will to be given the effect of an attempted disposition of property not owned by the testator, it is required that the language of the will conclusively evidence such a purpose. In such cases it is not sufficient that the will may be construed as revealing such an intention. It is necessary that it be open to no other construction."

Where it is apparent that such disposition is intended—that is, a disposition of the entire estate—the wife taking a substantial benefit under the will is an election which debars her from afterward asserting an inconsistent community claim. Rogers v. Trevathan, 67 Tex. 406, 3 S. W. 569; Smith v. Butler, supra; Chace v. Gregg, 88 Tex. 552.

32 S. W. 520; Lee v. McFarland, 19 Tex. Civ. App. 292, 46 S. W. 282.

[11] In order to constitute an election, the will must have given the wife something that she would not have had but for the will. Rogers v. Trevathan and Smith v. Butler, supra. In the case of Rogers v. Trevathan, the title to a 640-acre tract of land, community property of the testator and his wife, was involved. By the terms of the will the testator gave 118 acres to each of his five children, and the remaining 100 acres of the 640-acre tract he gave to his wife during her life, with remainder to the appellee, Mrs. Trevathan. There the court, among other things, said:

"Having only an undivided interest in the land, were the terms of the will ambiguous, the testator would be presumed to have intended to devise only his interest in the entire tract, but the specific devises of *a certain number of acres to each of his five children, and of the named residue to his wife for life*, with remainder to Mrs. Trevathan, left no doubt of his intention to dispose of the entire tract."

The italicized words indicate the points of similarity in that case to this one; for, while there was not a specific devise of land out of the common estate to any but one of the heirs, yet the specific devises and the residuary devise seem to render the cases much alike in principle.

In Smith v. Butler, supra, the estate of Ransom Butler and his wife consisted only of community property, and the land estate of two tracts, each containing 160 acres, upon one of which the family resided. This homestead tract, together with certain personal property, was given by the will of Butler to his wife for life, with remainder to his daughter and her child, and the other tract was given to the testator's son. It was contended that the testator, Ransom Butler, did not intend by the will to dispose of the interest of his wife in the real and personal estate. The contention was denied by Chief Justice Stayton in the following language:

"There can be no doubt that the testator intended to dispose of the entire community right in the lands owned by himself and wife, for he gave one tract, describing it, in its entirety to his son; while he gave the other to his wife during her life, with the remainder in its entirety to his daughter and her children. * * *

"It is true that, if susceptible of such a construction, the language of a testator ought to be held to refer to his own interest in community property, rather than to the entire property owned in common by husband and wife.

"It may be conceded, for the purposes of this case, that the bequest to the wife was intended to give to her during life, with absolute power of disposition, only his interest in the personal property referred to in the will; but this, with the devises of the land to the son and daughter, and her children, would present a case in which the wife was put to her election, for the wife would receive, if she took under the will, something she would not otherwise be entitled to, so far as the record shows, either by reason of her community right or as the surviving head of the family; and by the will the children of the testator would be deprived of some property to which they would have been entitled but for the will.

" 'The principle of election is that he who accepts a benefit under a will must adopt the whole contents of the instrument, so far as it concerns him, conforming to its provisions and renouncing every right inconsistent with it.' Philleo v. Holliday, 24 Tex. 45.

" 'Some free disposable property must be given to the electing donee which can become compensation for what the testator sought to take away.' Bige on Estop. 645.

"The compensating thing, however, need not be equivalent in value of that taken from the person put upon his election."

The will of Andrew Caddell gave his half of the homestead tract to his wife, Rhoda, irrespective of whether she should continue to occupy it as a homestead or not. She could have acquired a new homestead, and, under the law, have rented the old one and enjoyed all of its revenues during her life, however long thereafter. Moreover, it cannot be said that the residuary devise to her had no value. The reasonable and necessary conclusion is that the will devised the entire estate, and the widow so understood it, and elected to abide by it.

[12-15] By the fourth proposition under the first assignment, appellants' counsel assail the description in the above-mentioned deed from Andrew Caddell to David Brown.

From the foregoing statement by us, it will be clearly seen that by this deed Caddell intended to convey to Brown "half a league, more or less," but exactly half of the original survey. It was either the northwest half, cut off by a line running from the river N. 26° E. to the northeast line of the league, or it was the southeast half, divided off by a series of lines, one beginning on the northeast line and running thence S. 26° W. 1,092 varas, thence N. 64° W. 200 varas, and thence S. 26° W. to the river. It must be conceded that this presents a difficult case, unless the words used in the description, "it being the upper half" of a league fronting on a stream and each half clearly fronting on the stream, relieve the question of difficulties. It must be so held. For it is the natural and usual thing to speak of two shore surveys on a running stream as the upper and lower, according to their frontage. It is only this construction that would keep the description from being a nullity—a failure—and the familiar rule is that courts should rather incline to that construction of a document which would give it effect than to one which would make it ineffectual. And that principle is not inconsistent with what is said by the court in the case of Gorham v. Settegast, 44 Tex. Civ. App. 254, 98 S. W. 665, to the effect that—

"Men are presumed to be able among themselves to make deeds expressive of their intentions, and, if they fail to do so, or to furnish the means by which their intention can be determined, it would be a usurpation of authority for courts to undertake to make deeds for them."

The test is, Have they furnished means by which their intention can be determined, or must the instrument be held void for hopeless uncertainty of description?

The course of the dividing line or lines from the river shore to the northeast boundary, specifically N. 26° E., clearly requires two surveys having something near equal river frontage, one up and one down stream, and the quantity is exactly half the original survey. To hold that such a description is a void one would be going further, we think, than any other known case. Once the original survey of this case is ascertained, and it is conceded that "upper half" means the half having the upper frontage, there would be no great difficulty in platting the upper half so that it can be found by any one who could find the original survey. It is not so, we think, in the cases relied upon by appellants. For instance, the description in Harris v. Shafer, 86 Tex. 314, 23 S. W. 979, 24 S. W. 263, is, in effect, "1,800 acres, the upper part," of a survey which contains about a league. That tract having frontage on a river could have been located if the calls of the dividing line had been given. But not so without it.

No one, perhaps, could plat "1,800 acres the upper part of a survey," because the lines which must cut it off, not being fixed in course or even distance, may be varied indefinitely in location, and no means is given by such description to fix it in one location rather than another, although it might be conceded that its location must be in that part up the stream of the larger tract. But in the instant case, the location of the dividing line can be fixed by the clear and definite calls for course and for the quantity it is intended to cut off, and when it is once conceded that "upper" means up the stream, the dividing line necessarily becomes that call in the field notes for a line from the fifth corner on the bank of the river "N. 26° E. to the place of beginning," that is to "a stake on the N. E. boundary."

It would seem impossible to plat on any certain space in the supposed larger surveys the tracts intended to be conveyed by the descriptions given in other cases cited by appellants, and, undoubtedly, the principles declared in those cases are correct. They were not, however, cases of voluntary sales, such as this one, but no doubt the same rule applies to them in determining the question of a patent ambiguity. In other words, if it is apparent on the face of a description of land that it cannot be given any definite location, but may be equally well shifted to

234 S.W.—10

varying locations, it is void, whether it is a voluntary or involuntary deed, though a voluntary deed might be on a different basis if the question was presented whether or not it could be given effect to convey an undivided interest.

In applying the field notes of the deed executed by Andrew Caddell to Brown, we find that, while the calls for lines and corners, with bearing trees, which should correspond to calls for lines and to bearing trees at such corners, yet none of the bearing trees correspond. For example, it "begins at a stake on the N. E. boundary from which a post oak 9 inches bears N. 76° W. 3 varas, also a post oak 12 inches bears S. 65° E. 4.6 varas." This call for bearing trees does not correspond to the one for bearing trees at the northeast corner of the original survey, which would be the same corner if this deed was intended to convey the southeast half. But, on the other hand, no call for bearing trees corresponds to similar calls in the original field notes. The call for a line S. 26° W. 1,092 varas is identical with a call in the original field notes. But the next call, N. 64° W. 200 varas, only corresponds in course, but not in distance, with the call on the N. W. side of the original survey. The next call, S. 26° W. to the river (no distance stated), corresponds to that extent with the call of the field notes on the northwest side of the original survey. The tract could be given a location as the southeast half of the league, without changing any of its calls (unless a call for "stake on the N. E. boundary" could be regarded as conflicting with a location at the northeast corner), while to give the location as the northwest half requires the rejection of the call for a line of 200 varas as a mistake, and substitution of a line of 400 varas. Either location which may be given to it requires the supplying of one line (clearly omitted), in order to complete the description of its boundaries. The line to be supplied runs from the beginning point N. 64° W. along the northeast line of the league. It may be that the call for "beginning on the N. E. boundary," rather than at the northeast corner, as would naturally have been the call if the southeast half was intended, balances the conflict in the call for a line of 200 varas, where the original field notes would make it 400 varas; and it may be the improbability of its being intended to make the division with a series of lines, such as would be required if the location be taken rather than with a straight line N. 26° E., as would be the case if the northwest location be taken, would add to the certainty that the northwest location was intended. In case of uncertainty, that location should be taken which requires the rejection of the least number of calls as erroneous. This however, is only a rule of construction, and the only inflexible rule in these cases is that the intention of the makers of the in-

strument, as gathered from the instrument as a whole, in the light of extrinsic circumstances consistent with what is there expressed, must control.

It becomes the duty of the court to construe such instruments. If the construction fixes the location, then there is not a question of fact to be submitted to a jury. If the construction merely fixes the meaning of the instrument, leaving undetermined the location of the survey, then it would remain a question to be determined, under the evidence, where the exact location should be fixed, and the evidence, even then, may be undisputed and leave no question for the jury. This is a case where there is practically no dispute in the evidence when once the construction contended for by the appellees is adopted. The original grant shows the course of the river is such that the northwest half is the upstream half. From this, it follows, we think (if the upper is the upstream half), that the dividing line is that which is called for in the field notes of the deed from Caddell to Brown to run from the fifth corner on the river N. 26° E. to the place of beginning, which, in the first part of the field notes, is designated as "a stake on the N. E. boundary of the Caddell survey." That the upstream half is the "upper half" can, we think, hardly be doubted. Thus, in the case of Swisher v. Grumbles, 18 Tex. 173, part of the description of a shore survey was "all the upper half" of a league. It was treated as matter of course that the reference "upper" had relation to the flow of the stream, and designated the upstream half.

In the opinion of the Supreme Court, on motion for rehearing in the case of Harris v. Shafer, supra, Judge Brown referred to Swisher v. Grumbles, saying:

"The land is said to front on the river, and the lines are expressed to run from the river back; and the words 'upper' and 'lower' are necessarily used with reference to the flow of the river."

In 6 Tex. Civ. App. 15, 24 S. W. 846, is reported the case of Lunn v. Scarborough, in which the court, among other things, said:

"As this survey is situated on the river, its description (including the word 'upper') should be read in the light of this fact; and, when so read, we apprehend all seeming ambiguity will vanish away."

True, there was evidence in the instant case, on the trial below, to the effect that the more elevated land of the league was in the southeast half. The most natural way of designating such land, if it was intended to use that as an element of description, would be, we think, to use the term "higher half" or "upland half." The word "upper" was probably never used to designate the more elevated tracts in a survey of land. It is the common phrase to designate the higher levels of a stream or the upper tracts on a stream. In this case, the independent executor, John C. Caddell, in the deed to Johnson above referred to, seems to have given to the term "upper half" the construction which we have adopted when he sold the remaining half in 1881, designating it as the "east half," bounded on the south by the Angelina and "on the west by the half of the Caddell transferred by Andrew Caddell to David Brown."

We think that a proper location of the land is the upper location on the stream, and it is the half included between the northwest lines and a line running N. 26° E. from the river to the northeast boundary line of the league.

The effect of the foregoing conclusions is to dispose of all other assignments and contentions made by appellants, and it follows that none of them can be sustained, and that in the opinion of this court the trial court was not in error in peremptorily instructing the verdict against appellants; and the judgment will be affirmed.

### On Rehearing.

Having overruled appellants' motion for a rehearing, we are requested to make additional findings of fact, and, among others, to set out in full the field notes contained in the original grant to Andrew Caddell, and also the field notes contained in the deed from Andrew Caddell to David Brown. In the preparation of the opinion in this case, we deemed it immaterial to set out the field notes in these instruments in full, but have no hesitancy in granting appellants' request, and now do so.

The field notes, in full, as contained in the original grant, are as follows:

"The land surveyed to Colonist Andrew Caddell is situated on the northeast margin of the Angelina river; on which margin the first landmark, formed of a mound of earth around a stake, was raised; from which a gum 12 inches in diameter bears north 72 deg. west 8.2 varas distant, and another gum 20 inches in diameter bears south 82 deg. west 11 varas distant. Thence north 26 deg. east 10,712 varas were measured, and the 2nd landmark was raised; from which a pine 12 inches in diameter bears south 35 deg. east 5.8 varas distant and another pine 13 inches in diameter bears north 45 deg. west 10 varas distant. Thence north 64 deg. west 2,105 varas were measured, and the 3rd landmark was raised; from which a gum 9 inches in diameter bears north 81 deg. east 4 varas distant and a red oak 20 inches in diameter bears south 47 deg. east 9 varas distant. Thence south 26 deg. west 1,092 varas were measured, and the 4th landmark was raised; from which a dogwood 6 inches in diameter bears north 15 deg. east 8 varas distant and a white oak 12 inches in diameter bears south 62 deg. east 9 varas distant. Thence north 64 deg. west 400 varas were measured, and the 5th landmark was

raised; from which a pine 15 inches in diameter bears north 8 deg. east 7.2 varas distant and another pine 12 inches in diameter bears south 66 deg. east 8 varas distant. Thence south 26 deg. west 8,363 varas were measured, and the 6th landmark was raised, it being the last, from which a hickory 24 inches in diameter bears south 15 deg. east 8 varas distant, and a gum 12 inches in diameter bears north 30 deg. east 10 varas distant. Thence following said river along its meanders downward to the 1st landmark, thus completing the league of land which you ordered me to have surveyed."

The field notes in the deed from Andrew Caddell to David Brown are as follows:

"A certain tract or parcel of land * * * containing one-half league more or less lying and being in the county and republic aforesaid, lying on the northeast side of the Angelina river and known as the upper half of the said Caddell land or survey, beginning at a stake on the N. E. boundary of Caddell's survey at a stake from which a post oak 9 inches diameter bears N. 76° W. 3 varas, also a post oak 12 inches diameter bears S. 65° E. 4.6 varas. Thence S. 26° W. 1,092 vrs. to 2nd cor. a stake from which a pine 12 inch dia. brs. N. 58° W. 6.4 vrs. and white oak 22 in. dia. brs. S. 22° W. 10.8 vrs. Thence N. 64° W. 200 vrs. 3rd corner, a sweet gum 10 inch dia. from which a black oak 12 in. dia. brs. N. 80 deg. E. 2 vrs. and a hickory 14 inch dia. brs. N. 67 deg. W. 11.4 vrs. Thence S. 26 deg. W. 4th corner on bank of Angelina River on a Holly 5 in. dia. from which a white oak 42 in. dia. brs. N. 10 deg. W. 4.2 vrs. and a sassafras 8 in. dia. brs. S. 60 deg. W. 8.8 vrs. Thence with the meanders of the river to the 5th cor. Thence N. 26 deg. E. to the place of beginning containing one-half league of land more or less, being a part of the head right it being the upper half of the said Andrew Caddell."

We make this further additional finding: The evidence adduced upon the trial below showed, without contradiction we think, that the northwest half of the Andrew Caddell league was lower, from the standpoint of elevation, than the southeast half of the league, and that the east side of the league was the higher side, from the standpoint of elevation; that the league as a whole drains largely, not into the Angelina river, but to a creek called Harvey creek on the west, which creek runs to the river near the southwest corner of the league. There is more bottom or wider bottom on Harvey creek than on the river itself, and this bottom from Harvey creek extends practically eastward and covers a considerable part of the northwest portion of the Caddell league. Into Harvey creek several other drains empty, which rise on the eastern part of the league and flow downward through portions of the western part of the league and then into Harvey creek. Such drains run practically west into Harvey creek from higher lands to the east. Most of the bottom land of the creek and river, too, is on the west

side of the league. The drains that run west into Harvey creek are the ones that largely drain the greater portion of the league.

We are asked to make this further additional finding:

"Fourth. There is no evidence in the record that upon the death of Andrew Caddell in 1868, any debts, community or otherwise, existed against the estate, nor is there any evidence that any claims against the estate, whether for debts or legacies under the will, remained unsatisfied at the time of the death of his widow, Rhoda Caddell, in December, 1879, nor that there were any valid claims against such estate existing on October 26, 1881, the date of the deed from John C. Caddell as executor of the estate of Andrew Caddell to F. L. Johnson, through which deed alone defendants in error claim title to the southeast one-half of the league of land in controversy."

We decline to find, as requested, that there was no evidence introduced upon the trial showing the facts mentioned in the requested finding above, and the most that we find in that connection is that there was no direct and positive evidence of the facts there mentioned, but it is our opinion that there were circumstances of probative force tending to establish each of the facts mentioned in the requested finding, and this, too, without regard to the presumptions that should be indulged as mentioned in our opinion in this case.

We further find, as requested by appellants, that in December, 1869, John C. Caddell, as independent executor under the will of Andrew Caddell, filed an inventory of the estate, which included both real and personal property, and in such inventory said independent executor did not list any claims or debts against the estate.