**McMURREY CORPORATION et al. v.
YAWN et al.**

**No. 5622.**

Court of Civil Appeals of Texas. Texarkana.

Aug. 16, 1940.

Rehearing Denied Oct. 10, 1940.

W. M. Futch and Clifford L. Stone, both of Henderson, and F. W. Fischer, of Tyler, for appellants.

Jones & Jones, of Marshall, and Smith & West, of Henderson, for appellees.

HALL, Justice.

Addie Yawn, surviving wife, and the minor children of Girardus H. Yawn, appellees, instituted this suit against the McMurrey Corporation, the McMurrey Petroleum Corporation, the McMurrey Interests, the McMurrey Pipe Line Company, the McMurrey Refining Company, Marvin H. McMurrey, Jim McMurrey, and Lucille McMurrey, for damages occasioned by the alleged wrongful death of Girardus H. Yawn, hereinafter referred to as deceased. It was alleged that the McMurreys were partners, joint adventurers, or joint associates in the ownership and operation of certain oil properties located in Rusk County, among which was the oil lease known as the Pinkston lease, and that one Rudolph Loesewitz was employed by them to guard, supervise and manage said lease; that said Loesewitz as their agent and while acting within the scope or apparent scope of his authority as watchman, manager and operator of said lease, and not in his own self-defense, negligently and carelessly shot and killed deceased. In the alternative it was alleged that the killing of deceased was intentionally brought about by the conspiracy of the McMurreys acting by and through their agent, Loesewitz. All the McMurreys including the several companies answered denying partnership, and all except Jim McMurrey denied that Loesewitz was their employee or agent in any capacity. Jim McMurrey answered that after he purchased the Pinkston lease he employed Loesewitz to look after said lease "generally" and to flow the oil wells located thereon; that at the time Loesewitz killed deceased, he, Loesewitz, "was outside of his employment or the scope of his employment by this defendant; that said Rudolph Loesewitz, at the time of such killing, and immediately prior thereto, was acting in his own self-defense, for all of which this defendant is in no way liable for damages or any part of the damages sued for herein."

The record reflects that deceased operated and managed the Pinkston lease before it was purchased by Jim McMurrey. Shortly after its purchase he was discharged, and Loesewitz was employed in his stead. While deceased was working on the Pinkston lease he lived in a house located thereon. This house was purchased either by Jim McMurrey or some one for him, and was being moved on the day deceased was killed. Deceased had removed from the lease before his death. Loesewitz also lived in a house located on the lease about 200 or 300 feet from the house formerly occupied by deceased. After deceased had been discharged by appellant and before his death, some of the oil wells located on this lease had on two occasions been turned on at night, causing the tanks to overflow. Loesewitz thought that deceased was the party who turned on the wells and he so informed Jim McMurrey. On the day of the killing Loesewitz was informed that deceased was on the lease near the house where he had formerly lived. On receiving this information Loesewitz took his shotgun, went to where deceased was, and after speaking a few words to him shot and killed him. Loesewitz testified that threats by deceased to take his life had been, on two occasions, communicated to him; one on the night before, and the other a few minutes before the killing. Loesewitz also testified that, at the time of the killing, deceased by acts committed evidenced an intention to carry said threats into execution and that he shot him in self-defense. It later developed, however, that deceased was unarmed. The jury verdict upon special issues and the judgment rendered thereon were for appellees and against defendants Jim McMurrey, M. H. McMurrey, and the McMurrey Corporation, jointly and severally, who prosecute this appeal. The other defendants were dismissed from the case.

This action was brought under Article 4671, Sec. 1, R.C.S., by the dependents of deceased for damages for his alleged wrongful killing by Loesewitz. The evidence is undisputed that the killing of deceased was intentional and not the result of negligence. Self-defense was relied on as a justification for said killing. The court below charged the jury as follows:

"You are charged that by the term 'wrongful' as used in Special Issue No. 1, means the use of a greater degree of force than was reasonable and necessary under the circumstances then existing.

"Now bearing in mind the foregoing definitions and instructions, you will an-

swer the following special issues, to-wit: Special Issue No. 1:

"Do you find from a preponderance of the evidence that the action of Rudolph Loesewitz in shooting and killing the deceased, Girardus H. Yawn, was wrongful? Answer Yes or No."

Jury answer: "Yes."

By proposition No. 9 appellants challenge the correctness of this definition when applied to the facts and circumstances surrounding the defense of self-defense as shown by the testimony in the record. Appellants' proposition is: "In a civil suit to recover damages for the alleged wrongful death of the deceased, where the defendant's pleadings and evidence raise the issue that the deceased had made threats against the life of the defendant, which were communicated to the defendant, and that, by the demonstration made by the deceased, the defendant believed the deceased intended to carry out such threat, and, in defense of himself, he killed the deceased, it is error for the court to submit to the jury the bald question whether the action of the defendant in killing the deceased was wrongful, without instructing the jury upon the law of threats and self-defense and justifiable homicide. An instruction that the term 'wrongful', as used in the question, means the use of a greater degree of force than is reasonable and necessary under the circumstances then existing, is entirely inadequate, misleading, and gives to the jury the impression that the killing of the deceased was the exercise of a greater degree of force than was necessary, and was, therefore, wrongful."

 If Loesewitz was acting in his own self-defense at the time he shot and killed deceased, the killing in law would not be wrongful but justifiable. This is true in a civil action as well as in a criminal action. It was said in the early case of March v. Walker, 48 Tex. 372: "The law of self-defense is the same as in a criminal prosecution, with the exception of the rule of evidence which, in a criminal cause, gives the defendant the benefit of a reasonable doubt. That doubt, however, is as to the facts,—not as to the extent of the right. The stage of the difficulty at which self-defense ceases is just the same, whether the question be investigated civilly or criminally."

To the same effect are Croft v. Smith, Tex.Civ.App., 51 S.W. 1089; St. Louis Southwestern R. Co. of Texas v. Huddleston, Tex.Civ.App., 178 S.W. 704, writ refused. This defense was not only available to Loesewitz had he been sued, but also to his principals, appellants herein. Cameron Compress Co. v. Kubecka, Tex. Civ.App., 283 S.W. 285, writ refused. Loesewitz testified that he thought deceased on two occasions at night had turned on the oil wells located on said lease, causing the oil tanks to overflow; that he had deceased make tracks for comparison with "boot tracks" found near the oil wells; that he reported to the sheriff's office of Rusk County and to the officers of the Railroad Commission that said oil wells had been turned on. Loesewitz testified further that he went to see the district attorney of Rusk County for the purpose of having deceased placed under a peace bond to avoid having trouble with him. On the night before deceased was killed Loesewitz testified that his (Loesewitz's) wife told him that deceased "was coming on the lease and get me"; that about fifteen minutes before the killing "T. M. Hill came up and told me that Buck Yawn (deceased) was down on the lease and had a gun and was going to—he said, 'going to kill you the first time he saw you.'" Loesewitz testified further:

"Q. When Hill told you that, what did you do? A. I got me a gun and went down there to get him to carry him to town.

"Q. Well, how near did you get to him before you saw him? A. I judge between 20 and 30 steps.

"Q. Did you say steps? A. I said steps but I mean feet, between 20 and 30 feet.

"Q. What did you say to him, if anything? A. I said, 'All right, Buck come and go with me, you are going to town.'

"Q. What did he do, if anything? A. He made about two steps and went left hand to his waist—

"Q. What did you say or do, if anything? A. I did not say anything or do anything, I just raised my gun and shot.

"Q. Then what did you do? A. I turned around and went to the Lispen Gasoline plant and called the sheriff's department and told them to call Jim McMurrey, told them about what had happened.

"Q. Who was the first person you saw after you had shot Buck Yawn? A. My wife—I believe it was my wife.

"Q. Do you know Mr. Larner? A. Yes, I know him.

"Q. Did you see him first or your wife? A. I can not say for sure whether it was him or my wife.

"Q. What statement, if any, did you make to Mr. Larner about Buck? A. The same statement I made to every one, the only statement I made was to go and watch him and don't let them take that gun off of him.

"Q. How long was that after you had fired the shot that had killed Buck Yawn? A. About as long as it would take you to walk around—say 100 feet.

"Q. What was Buck Yawn doing, just prior to the time that you fired the shot that killed him? A. He was walking toward me.

"Q. Was he doing anything else? A. Well, when I first seen him he had his back towards me and was walking off.

"Q. When he started towards you what movement did he make with his hands? A. He went left-handed for his shirt, like he was going in his shirt after something.

"Q. What did you think he was going to do? A. I thought my time had come; I thought he would probably kill me.

"Q. What did you think he was going to kill you with? A. I thought he had a gun in his belt.

"Q. Did you know the reputation that Buck Yawn bore in that neighborhood, and in that vicinity, for being a law-abiding man? A. I had heard about him toting a pistol and shooting out lights out of those honkey-tonks up and down the highway.

* * * * * *

"Q. When you put the Ford pick-up in the Rushing garage and walked home, who was it that you were afraid of that night, who was it you were afraid would come, or might? A. Well my wife told me it was Buck Yawn.

"Q. From what your wife had told you about what was going on up at the store, they were going to get you that night, you left it there because you were afraid that Buck Yawn and whoever might be with him would come? A. Yes.

"Q. That was Friday night before the killing on Saturday? A. Yes, sir."

This testimony, in our opinion, clearly raises the issue of communicated threats and self-defense, and the court's definition of the term "wrongful" as applied to the facts in this case is incorrect. If at the time of the killing the deceased by his acts and conduct reasonably induced Loesewitz to believe that deceased was about to attack him with a deadly weapon which would probably cause Loesewitz' death or some serious bodily injury; or if by the acts of the deceased it reasonably appeared to Loesewitz at the time, viewed from his standpoint alone, that deceased was then about to attack him with a deadly weapon which would probably cause Loesewitz' death or some serious bodily injury, and if same was reasonably calculated to create in the mind of Loesewitz, and did create in his mind, a reasonable expectation of fear of death or some serious bodily injury, and that Loesewitz then and there moved and actuated by such reasonable expectation of fear of death or serious bodily injury, shot and killed deceased, then under such circumstances the killing would be in his lawful self-defense and would not be "wrongful." Where a person accused of murder seeks to justify himself on the ground of threats against his own life, he may be permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the offense, unless it be shown that at the time of the homicide the person killed by some act then done manifested an intention to execute the threats so made. If deceased did make threats against the life of Loesewitz and at the time of the killing deceased made such an act or demonstration as reasonably to produce in the mind of Loesewitz, viewed from his standpoint at the time, a belief that deceased then and there intended to execute such threats and to take the life of Loesewitz, or to do him some serious bodily harm, then the killing would not be "wrongful." It is not essential to the right of self-defense that real danger should exist. If from Loesewitz' standpoint, taking into consideration all the facts and circumstances surrounding the parties, it reasonably appeared to him that he was in danger of death or serious bodily injury, under the law he had the right to defend against such apparent danger to the same extent as if the danger were real, and if he shot and killed the deceased under such circumstances the killing would not be "wrongful." Kelly v. State, 68 Tex.Cr.R.

317, 151 S.W. 304. This omission from the definition of the term "wrongful" in the court's charge preceding Special Issue No. 1 is vital, and calls for a reversal of this case. Barrow v. Barclay, Tex.Civ.App., 269 S.W. 235, writ refused; Whitaker v. Haynes, Tex.Civ.App., 128 S.W.2d 532. The converse of the above is also true; that is to say, if Loesewitz used a greater degree of force than was reasonable and necessary under the circumstances existing at the time of the killing and was not acting in his own necessary self-defense as explained above, the killing would be "wrongful."

■ Appellants' tenth proposition complains of admission in evidence over their objection of portions of Mrs. Loesewitz' and Mrs. Brown's depositions taken in another cause. It appears from the record that cause No. 13202 was filed on October 6, 1937. Notice to take the oral depositions of Mrs. Loesewitz and Mrs. Brown was issued on the same day, that said depositions were taken on October 23, 1937, and were returned and filed November 3, 1937. Pleas of privilege of Marvin McMurrey and Mrs. R. J. McMurrey were filed October 26, 1937, and that of Jim McMurrey was filed November 5, 1937. To these pleas, controverting affidavits were filed. The main suit, on motion of appellees, was dismissed November 23, 1937. Under this state of facts it could not be said that the depositions of Mrs. Loesewitz and Mrs. Brown were taken in connection with "the case" made by the filing of the pleas of privilege and the controverting affidavits, as contemplated by Article 2018, R.C.S., for the reason that notice to take and the taking and filing of said depositions occurred several days before appellants filed their pleas of privilege. So it must be held that these depositions were in fact taken and filed in the main cause of action, No. 13202. This suit, No. 13334, filed November 27, 1937, although between practically the same parties and involving the same subject matter as No. 13202, is a different cause within the meaning of Article 3766, R.C.S., and the depositions of Mrs. Loesewitz and Mrs. Brown taken in cause No. 13202 were improperly admitted in evidence in cause No. 13334. This assignment is sustained. People's National Bank v. Mulkey, 94 Tex. 395, 60 S.W. 753; Caddell v. Lufkin Land & Lbr. Co., Tex.Com.App. opinion adopted by Sup.Ct., 255 S.W. 397; Martinez v.

Bruni, Tex.Com.App. opinion approved, 235 S.W. 549; Castleberry v. Bussey, Tex.Civ.App., 166 S.W. 14, writ refused; Texas & P. R. Co. v. Gurian, Tex.Civ.App., 77 S.W.2d 274, writ dismissed; Connecticut Gen. Life Ins. Co. v. Smith, Tex.Civ.App., 94 S.W. 519, writ dismissed.

All other propositions brought forward have been carefully examined, are thought to be without merit, and are therefore overruled.

The judgment is reversed, and the cause remanded.